UNITED STATES of America,
Plaintiff-Appellee,

v.

Michael Santo POLIZZI, Defendant-
Appellant.

UNITED STATES of America,
Plaintiff-Appellee,

v.

Jack S. SHAPIRO, Defendant-
Appellant.

UNITED STATES of America,
Plaintiff-Appellee,

v.

Peter James BELLANCA, Defendant-
Appellant.

UNITED STATES of America,
Plaintiff-Appellee,

v.

Anthony GIARDANO, Defendant-
Appellant.

UNITED STATES of America,
Plaintiff-Appellee,

v.

Arthur J. ROOKS, Defendant-
Appellant.

UNITED STATES of America,
Plaintiff-Appellee,

v.

Anthony Joseph ZERILLI, Defendant-
Appellant.

UNITED STATES of America,
Plaintiff-Appellee,

v.

EMPRISE CORPORATION, a New York
corporation, Defendant-Appellant.

Nos. 72–2983 to 72–2989.

United States Court of Appeals,
Ninth Circuit.

April 30, 1974.

As Modified on Denial of Rehearing
July 18, 1974.

Richard A. Murphy (argued), Robert E. Hinerfeld, Simon, Sheridan, Murphy, Thornton & Hinerfeld, Los Angeles, Cal., for defendant-appellant in 72–2983.

Thomas Kotoske, Asst. U. S. Atty. (argued), William D. Keller, U. S. Atty., Richard Rosenfield, Earl Boyd, Asst. U.

S. Attys., Los Angeles, Cal., for plaintiff-appellee.

Edward M. Medvene (argued), Robert E. Hinerfeld, Simon, Sheridan, Murphy, Thornton & Hinerfeld, Los Angeles, Cal., for defendant-appellant in 72–2984.

Stanley E. Beattie (argued), James V. Bellanca, Jr., Bellanca & Beattie, Detroit, Mich., for defendant-appellant in 72–2985.

Irl B. Baris (argued), Newmark & Baris, St. Louis, Mo., for defendant-appellant in 72–2986.

Joseph A. Ball (argued), Joseph D. Mullender, Jr., Laurence F. Jay, Ball, Hunt, Hart, Brown & Baerwitz, Anthony Murray, Hitt, Murray & Caffray, Long Beach, Cal., for defendant-appellant in 72–2987.

William J. Weinstein (argued), Weinstein, Kroll & Gordon, Detroit, Mich., for defendant-appellant in 72–2988.

John P. Frank (argued), Lewis & Roca, Phoenix, Ariz., Joseph D. Mullender, Jr., Ball, Hunt, Hart, Brown & Baerwitz, Long Beach, Cal., for defendant-appellant in 72–2989.

## OPINION

Before BROWNING and DUNIWAY, Circuit Judges, and RENFREW,* District Judge.

RENFREW, District Judge:

In 1966 and 1967, appellants Zerilli and Polizzi acquired hidden interests in Vegas Frontier, Inc. (VFI), a Nevada corporation, which leased and operated the Frontier Hotel in Las Vegas, Nevada. VFI was also licensed to conduct gambling at the hotel, which opened in July of 1967. Neither Zerilli nor Polizzi was licensed by the Nevada gaming authorities, nor was either man's interest in VFI disclosed to those authorities. After extensive negotiations, VFI was sold in November, 1967, to Howard Hughes.

Following a very lengthy and complex trial,[1] Zerilli, Polizzi, and the other appellants were convicted of conspiracy (18 U.S.C. § 371) to violate 18 U.S.C. § 1952[2] (Interstate and Foreign Travel or Transportation in Aid of Racketeering Enterprises) and of substantive violations of that section. Appellants challenge their convictions on a number of bases. They contend:

1. That the prosecution failed to show a violation of § 1952.

2. That, if a violation were shown, the laws in question would be unconstitutionally vague.

3. That the court erred in instructing the jury.

4. That the publicity surrounding their trial deprived them of a fair trial and that there was jury misconduct which the court refused to investigate.

5. That the label "Mafia" was applied to them in a public list of Mafia figures made by the Department of Justice and that the list was submitted in the grand jury proceedings and

---

* The Honorable Charles B. Renfrew, United States District Judge, Northern District of California, sitting by designation.

1. There were 48 days of trial reported in 11,022 pages of reporter's transcript (including post-trial motions), and 321 exhibits were received in evidence.

2. 18 U.S.C. § 1952 provides in part:

"(a) Whoever travels in interstate or foreign commerce or uses any facility in interstate or foreign commerce, including the mail, with intent to—

(1) distribute the proceeds of any unlawful activity; or

(2) commit any crime of violence to further any unlawful activity; or

(3) otherwise promote, manage, establish, carry on, or facilitate the promotion, management, establishment, or carrying on, of any unlawful activity,

and thereafter performs or attempts to perform any of the acts specified in subparagraphs (1), (2), and (3), shall be fined not more than $10,000 or imprisoned for not more than five years, or both.

(b) As used in this section 'unlawful activity' means (1) any business enterprise involving gambling * * * offenses in violation of the laws of the State in which they are committed or of the United States * * *."

in the trial in this case and that these actions constitute a deprivation of their rights of due process.

6. That the trial court committed error in the permission it gave to the prosecution to cross-examine certain of the appellants about their reputations as members of the Mafia when the appellants had not presented evidence of character or reputation.

7. That they were deprived of a fair trial by misconduct of the prosecutor which the trial court sanctioned.

8. That the testimony of a key prosecution witness should have been stricken in that the prosecution's untimely production of his pretrial statements violated the Jencks Act.

9. That error was committed in the admission of the testimony of that witness on the grounds that part of the testimony was conclusively demonstrated to be false, and admitted to be false by the witness.

10. That promises of leniency made to the witness by the prosecution were not disclosed.

11. That the acts complained of were a unitary crime and that it was not proper for them to be convicted of a conspiracy and substantive violations based upon the same conduct.

12. That the venue of the trial court was improper.

13. That the court below erred in refusing to grant appellant Giordano's [2a] motion for severance.

14. That the court below erred in failing to instruct the jury that evidence admitted after appellant Giordano had rested at the close of the prosecution's case could not be considered against him.

15. That appellant Giordano's motion for acquittal at the close of the prosecution's case should have been granted.

16. That appellant Emprise is not liable for any criminal acts that its predecessor in interest allegedly committed.

17. That the evidence was insufficient to support their convictions.

18. That the trial was materially tainted by leads from unlawful electronic surveillance.

Having carefully considered each of these contentions, we affirm the convictions below. Although this opinion is longer than we would have preferred, appellants have raised and argued so many points in 534 pages of briefs, exclusive of appendices and exhibits, that we find a lengthy opinion unavoidable.

## I. *Violation of § 1952*

Appellants' threshold contention is that their conduct did not come within the coverage of the federal Travel Act (18 U.S.C. § 1952), raising two issues as to the meaning of the statute. Section 1952 condemns interstate travel or the use of interstate facilities in the furtherance of "any unlawful activity," defined as including "any business enterprise involving gambling * * * offenses in violation of the laws of the State in which they are committed or of the United States * * *." A violation of § 1952 thus must be premised upon another distinct violation of state or federal law.

Although state law becomes the focus of this inquiry, "the gravamen of a charge under § 1952 is the violation of federal law * * *." United States v. Karigiannis, 430 F.2d 148, 150 (7 Cir. 1970) (Clark, J.), cert. denied, 400 U.S. 904, 91 S.Ct. 143, 27 L.Ed.2d 141 (1970). "Reference to state law is necessary only to identify the type of unlawful activity in which the defendants intended to engage." United States of America v. Rizzo, 418 F.2d 71, 74 (7 Cir. 1969), cert. denied, 397 U.S. 967, 90 S.Ct. 1006, 25 L.Ed.2d 260 (1970).

While the Government's theory was not succinctly stated, either in its brief or at oral argument, it does emerge

---

2a. In the indictment, appellant's name was spelled Giardano. His true name is Giordano.

from a careful reading of the indictment and information[3] together with the court's instructions to the jury[4] that appellants violated the federal Travel Act by conduct which was a "business enterprise" that involved "gambling \* \* \* offenses" in violation of Nevada Revised Statutes (N.R.S. § 463.160[5] in that Zerilli and Polizzi's interests in the gambling conducted by VFI at the Frontier Hotel were hidden from the Nevada gaming authorities.

Appellants' first argument is that since VFI had a gambling license as required by Nevada law, their activity could not be unlawful within the meaning of the federal Travel Act. They rely considerably on one instruction, to which the government did not object, that VFI was licensed and that the gambling it conducted could not be found illegal.[6] Appellants' counsel stated at oral argument that, even if appellants procured the VFI license fraudulently, there would be no criminal violation of Nevada law. We disagree.

This instruction meant only that the trial court did not believe that the prosecution could rely upon N.R.S. § 463.-160(1)(a). The license would not be

3. The indictment names the six individual appellants and the information names appellant Emprise Corporation, the successor in interest to a merged corporation of the same name which had been dismissed from the indictment for lack of personal jurisdiction prior to trial.

4. Both the information and indictment contain the following language charging appellants with traveling "in interstate commmerce and [using] facilities in interstate commerce with intent to:
"1. Distribute the proceeds of unlawful activity, namely: the ownership, operation of, and receipt of profits from a Las Vegas, Nevada gaming casino by persons who were not licensed and whose interest in the gaming casino had been concealed from agencies of the State of Nevada in violation of Nevada law; and
"2. Promote, manage, establish, carry on, and facilitate the promotion, management, establishment and carrying on of unlawful activity, namely: the ownership, operation of, and receipt of profits from a Las Vegas, Nevada gaming casino by persons who were not licensed by and whose interest in the gaming casino had been concealed from agencies of the State of Nevada in violation of Nevada law \* \* \*."
The court's instructions to the jury were also couched in terms of the failure to disclose the interests of Zerilli and Polizzi in VFI.

5. Nevada Revised Statutes (N.R.S.) § 463.160 lays down the basic law requiring a license for gambling operations:
"1. It is unlawful for any person, either as owner, lessee or employee, whether for hire or not, either solely or in conjunction with others:
"(a) To deal, operate, carry on, conduct, maintain or expose for play in the State of Nevada any game or slot machine as defined in this chapter, or to operate, carry on, con-

duct or maintain any horserace book or sports pool; or
\* \* \* \* \*
"(c) To receive, directly or indirectly, any compensation or reward or any percentage or share of the money or property played, for keeping, running, carrying on or permitting the same to be carried on, without having first procured, and thereafter maintaining in full force and effect, all federal, state, county and municipal gaming licenses as required by statute or ordinance \* \* \*."
N.R.S. § 463.170 then indicates what information must be disclosed if a license is to be obtained by a corporation:
"2. No corporation \* \* \* shall be eligible to receive or hold any license under this chapter unless all persons having any direct or indirect interest therein of any nature whatsoever, whether financial, administrative, policy making or supervisory, are individually qualified to be licensed under the provisions of this chapter."
[Appellants contend that the revised N.R.S. § 463.170(2), effective July 1, 1967, should have been applied. In footnote 11, *infra*, we point out the error in that contention.]
The statute governing the disclosures to be made in an application for a license provides:
"2. The application shall include:
\* \* \* \* \*
"(d) The names of all persons directly or indirectly interested in the business and the nature of such interest." N.R.S. § 463.200.
The forms supplied for an application by a corporation indicate that corporate officers and stockholders are to be listed as those persons interested in the business.

6. "Since in this case a license was issued to the corporation VFI, any gambling conducted by or through VFI would not be illegal and would not be in violation of this statute [N. R.S. § 463.160]." Reporter's Transcript, Vol. 43, p. 8798.

viewed as void *ab initio*, and the appellants could not be prosecuted for conducting a gambling enterprise without a license. Nor could the prosecutor "pierce the corporate veil" to reach appellants.[7] The instruction does not, however, legitimize all the acts of appellants in obtaining the license. N.R.S. § 463.160(1)(c) covers precisely the charges here against appellants: receiving compensation from gambling conducted without having procured and maintained licenses as required by law.[8]

Appellants argue, however, that N.R.S. § 463.160(1)(c) only requires that the gambling be licensed and does not reach fraud or other violations in obtaining the license. Acceptance of this construction of Nevada law would effectively emasculate the statutory scheme of requiring the disclosure of the identities of the persons who would be involved in the gambling enterprise. This disclosure requirement has as its purpose the prevention of the infiltration of criminal elements into gambling in Nevada.[9] Section 463.160(1)(c) requires not only that a license be procured and maintained, but also that it must be procured and maintained in a manner that satisfies the other provisions of the gambling law. The term "as required by statute" must be viewed in light of the strong state policy behind the statutes. The interpretation offered by appellants would give free rein to criminal elements in their attempts to infiltrate Nevada gambling. The most they would risk would be the administrative revocation of their corporation's license. They would become criminally liable only if they operated a gambling enterprise without procuring a license, and the most dangerous elements could easily avoid such a blatant violation of Nevada law. Given these considerations, the only reasonable construction of N.R.S. § 463.160(1)(c) is that persons receiving compensation from the gambling operation must fulfill all other state requirements surrounding the granting of a license.[10]

Appellants violated those other provisions by failing to disclose the identities of Zerilli and Polizzi as persons having an interest in VFI. Under N.R.S. § 463.170(2), applicants for a corporate license had to disclose "persons having any direct or indirect interest therein of any nature whatsoever, whether financial, administrative, policymaking or supervisory * * *."[11]

7. See footnote 13, *infra*.

8. See footnote 5, *supra*, for the language of the statute.

9. "It is hereby declared to be the policy of this state that all establishments where gambling games are conducted or operated or where gambling devices are operated in the State of Nevada shall be licensed and controlled so as to better protect the public health, safety, morals, good order and general welfare of the inhabitants of the State of Nevada." N.R.S. § 463.130(1).

The Nevada Supreme Court, in a decision handed down two years prior to the enactment of the statutes here in question, gave a strong policy basis for the licensing requirement:

"Nevada gambling, if it is to succeed as a lawful enterprise, must be free from the criminal and corruptive taint acquired by gambling beyond our borders. If this is to be accomplished not only must the operation of gambling be carefully controlled, but the character and background of those who would engage in gambling in this state must be carefully scrutnized.

" * * * The risks to which the public is subjected by the legalizing of this otherwise unlawful activity are met solely by the manner in which licensing and control are carried out." Nevada Tax Commission v. Hicks, 73 Nev. 115, 119–120, 310 P.2d 852, 854 (1957). See also Berman v. Riverside Casino Corporation, 247 F.Supp. 243, 250 (D.Nev.1964), aff'd, 354 F.2d 43 (9 Cir. 1965).

This statement of policy was not qualified but rather reaffirmed by N.R.S. § 463.130(1), *supra*.

10. *See* Huddleston v. United States, 415 U.S. 814, 819–823, 94 S.Ct. 1262, 39 L.Ed.2d 782 (1974) ; *cf*. Rewis v. United States, 401 U.S. 808, 811–812, 91 S.Ct. 1056, 28 L.Ed.2d 493 (1971).

11. Appellants have contended in their briefs that the revision of this section effective July 1, 1967, should be applied. They did not press this point at oral argument. We find their contention untenable. Although VFI's license was not issued until July 5, 1967, to be effective July 27, 1967, the Chairman of the Nevada Gaming Commission during the time

The disclosure requirement must be complete in order to meet the policy of the Nevada gambling laws. Appellants stress that the corporate-license application form supplied by the state required only the listing of the names of corporate officers and shareholders. Since VFI's application complied with this requirement, they argue, there was no failure to disclose. This argument, if accepted, would turn the detailed statutes governing the control of licensing into a mere formality. Disclosure of nominal officers and shareholders would guarantee legality and shield the very persons as to whom the disclosure requirements are directed. The Attorney General of Nevada in 1960 gave his opinion that N.R.S. § 463.170(2) gave power to state authorities "to require those persons having administrative, policymaking or supervisory interest in the operation to qualify for licensing." To utilize that authority effectively, he stressed, the authorities would need to obtain information about those persons. Official Opinions of the Attorney General of Nevada, 1960–1962, pp. 83–84 (1960). There was no hint that formalities suffice or should be exalted over substance. In this case, the information and indictment emphasized that Zerilli and Polizzi held the real interests in VFI and controlled the nominal shareholders. The trial court, in its instructions on the definition of "owner" as used in the Nevada statutes, stressed the reality of ownership rather than formal titles. (Reporter's Transcript, Vol. 43, p. 8765.) These statutes require disclosure of the names of all persons with *actual* control or financial interests in the gambling enterprise.[12]

■ The acts of appellants charged and proven in this case therefore were prohibited by state law.[13] Appellants, however, raise further objections. They contend that, even if they did violate Nevada law, their violations were not *criminal* and therefore do not come within the ambit of § 1952. They characterize their conduct as merely "operating a casino with a state corporate li-

in question testified that VFI had completed all the formal requirements for a license by June 28, 1967, and that it had a right to a license on that date. VFI itself had requested that the license be effective as of July 27, 1967. There is no indication that appellants made any attempt to comply with the new, revised statute, which included reporting requirements in many ways more stringent than those in the old statute. *See* N.R.S. § 463.-520. Nor is there any indication that the Board sought to require appellants to comply with the new statute. Thus the Board necessarily interpreted the statutes to mean that the old statute rather than the new statute governed applications completed before the new statute went into effect. Such an administrative interpretation is entitled to great weight. See footnote 12, *infra*. Moreover, appellants apparently acquiesced in this interpretation. In these circumstances, the trial court applied the correct statute.

12. The record reveals that the Nevada authorities sought in this case to go "behind" the nominal officers and shareholders and conducted a vigorous investigation to ascertain who controlled VFI. The Court gives weight to the manner in which the Nevada gaming authorities have construed the statutes under which they operate.

13. Two other theories put forward by the government fail. One involves "piercing the corporate veil." The government argues in its brief that the Nevada statutes "provide the gaming authorities with the necessary authority to go behind the corporate license to *determine who in fact* is controlling the corporation which was granted the gaming license" (emphasis in original). That argument is foreclosed by the trial court's instruction, to which the government did not object, quoted in footnote 6, *supra*. Although that interpretation of N.R.S. § 463.160(1)(a) was not the only one possible, it is not an unreasonable construction. This Court accepts it as the law of this case.

The other theory is that N.R.S. § 463.160 (1) requires that anyone with a direct or indirect interest in a gambling enterprise must be licensed. That statute, however, requires only that licenses must be procured as required by the law. N.R.S. § 463.170(2) indicates that a corporation can receive and hold a license itself and that those persons with interests in the corporation must only be *qualified to be* licensed. *See also* Berman v. Riverside Casino Corporation, 354 F.2d 43 (9 Cir. 1965).

cense but without other required state licenses." That theory, however, is based upon the government's contention that all persons with a direct or indirect interest in a gambling casino must be licensed. We find no such requirement in Nevada law.[14] The violations of Nevada law in question here were not by VFI, but rather by those in control of VFI who did not disclose the interests of Zerilli and Polizzi. The trial court preserved the corporate fiction and the legality of the gambling operations conducted by the corporation. Hence appellants' argument that N.R.S. § 463.310 specifically establishes only an administrative penalty available to the authorities in this case—revocation of VFI's license—is in error. That provision does set the procedures for disciplinary action against the licensee, but here the licensee has not been prosecuted for violating Nevada law. Since there is no specific penalty prescribed for a violation of N.R.S. § 463.160(1)(c), the "catch-all" section, N.R.S. § 463.360(2)[15] would apply.[16] That violation, there characterized as a gross misdemeanor, would be a *criminal* infraction.[17]

■ Appellants' second argument is that § 1952 reaches only *wholly* unlaw-ful business enterprises and, since gaming is legal in Nevada, the federal Travel Act does not apply. They cite United States v. Roselli, 432 F.2d 879 (9 Cir. 1970), cert. denied, 401 U.S. 924, 91 S. Ct. 883, 27 L.Ed.2d 828 (1971), rehearing denied, 402 U.S. 924, 91 S.Ct. 1366, 28 L.Ed.2d 665 (1971), in support. Their reliance upon *Roselli* is misplaced. There the Court accepted only for the purposes of argument the premise that the scope of § 1952 was limited to illegal business enterprises and even on that basis found such an illegal enterprise (432 F.2d 879 at 887–888). Appellants overlook that earlier in that opinion this Court observed:

> "If section 1952 applied only when all business activity was absolutely prohibited in the particular field, the reach of the section would be materially diminished without apparent reason in terms of the statute's purpose. There is no evidence that Congress intended this result." 432 F.2d 879 at 887.

Nor do appellants' general references to the legislative history of § 1952 support this contention.[18] The statutory language is clear. "Section 1952 speaks not of illegal gambling, but of a more

14. See footnote 13, *supra.*

15. "The violation of any of the provisions of this chapter, the penalty for which is not herein specifically fixed, shall be deemed a gross misdemeanor, and shall be punished by a fine of not less than $1,000, or by imprisonment in the county jail for not less than 6 months, or by both fine and imprisonment."

16. The Chairman of the Nevada Gaming Commission during the time in question testified that under the law then in effect, "any violation" of that law by individuals would mean that those individuals were guilty of gross misdemeanors where no specific penalty was provided. Reporter's Transcript, Vol. 15, pp. 3028–3029.

Indeed, other than conducting a casino without a license, which is exceedingly unlikely, it is difficult to imagine what N.R.S. § 463.360 (2) would cover if it did not cover conduct such as that proved in this case.

17. Once a violation of a state criminal statute has been proved it is irrelevant whether that violation is classified as a felony or misdemeanor. United States v. Karigiannis, 430 F.2d 148, 150 (7 Cir. 1970) (Clark, J.), cert. denied, 400 U.S. 904, 91 S.Ct. 143, 27 L.Ed. 2d 141 (1970).

18. Appellants rely heavily upon the statements of Assistant Attorney General Herbert J. Miller, Jr., of the Justice Department's Criminal Division that:

"[The Travel Act] bans unlawful businesses —not incidental illegal acts done in the course of lawful businesses." ("Legislation Relating to Organized Crime," Hearings on H.R. 468 et al., Before Subcommittee No. 5 of the House Committee on the Judiciary, 87th Cong., 1st Sess., p. 336 (1961).)

"Under this bill we would have to show a business enterprise which was unlawful under the laws of the State * * *." ("The Attorney General's Program to Curb Organized Crime and Racketeering," Hearings on S. 1653 et al., Before the Senate Committee on the Judiciary, 87th Congress, 1st Sess., p. 260 (1961).)

inclusive category: 'gambling * * * offenses.'" United States v. Roselli, 432 F.2d 879, 887 (9 Cir. 1970), cert. denied, 401 U.S. 924, 91 S.Ct. 883, 27 L. Ed.2d 828 (1971), rehearing denied, 402 U.S. 924, 91 S.Ct. 1366, 28 L.Ed.2d 665 (1971). *See also* Turf Center, Inc. v. United States, 325 F.2d 793, 795 (9 Cir. 1963).

This Court's construction of the scope of § 1952 will not open the federal courts to the prosecutorial abuses which appellants have depicted for the Court: prosecutions of minor illegal acts incidental to an otherwise legal business. The legislative history of § 1952 does demonstrate that its main purposes are to attack organized crime and to aid local authorities in combatting it.[19] Courts would simply not allow it to be used to extend federal prosecutions far from these purposes.[20] *See* Erlenbaugh v. United States, 409 U.S. 239, 245, 93 S.Ct. 477, 34 L.Ed.2d 446 (1972).

We conclude that appellants engaged in a business enterprise involving gambling offenses in violation of Nevada law and 18 U.S.C. § 1952.

## II. *Vagueness*

Appellants challenge the statutes under which they have been charged and convicted as being unconstitutionally vague. "No one may be required at peril of life, liberty or property to speculate as to the meaning of pe-

nal statutes. All are entitled to be informed as to what the State commands or forbids." Lanzetta v. New Jersey, 306 U.S. 451, 453, 59 S.Ct. 618, 619, 83 L.Ed. 888 (1939). Appellants' attack is directed at the Nevada statutes and not the language of § 1952, which has been upheld previously against claims of vagueness. *See, e. g.,* United States v. Cozzetti, 441 F.2d 344, 348 (9 Cir. 1971); Turf Center, Inc. v. United States, 325 F.2d 793, 795 (9 Cir. 1963); United States v. Smith, 209 F.Supp. 907, 917–918 (E.D.Ill.1962). We have already held that the Nevada statutes clearly proscribe the conduct charged against appellants.[21] The construction of those statutes urged by appellants is unreasonable and conflicts with the manifest purpose of the Nevada gambling legislation requiring precise and stringent controls relating to the licensing of gambling. Violation of the statutes in the manner charged against appellants is a criminal offense.[22] In affirming these convictions, we are not enlarging the original legislation by interpretation. *Cf.* Bouie v. City of Columbia, 378 U.S. 347, 350–352, 84 S.Ct. 1697, 12 L.Ed.2d 894 (1964); Pierce v. United States, 314 U.S. 306, 311, 62 S. Ct. 237, 86 L.Ed. 226 (1941).

Moreover, the trial court instructed the jury that specific intent was an element of the offense charged against appellants.[23] Thus the jury found that appellants knew that Nevada law had been violated in the procurement of

---

In a law review article, the Assistant Attorney General explained the impact of the statutory intention thusly:

"[T]o turn a gambling * * * scheme into an 'unlawful activity' within the meaning of the 'Travel Act' * * * the 'business enterprise' must involve *illegal* conduct. A program to establish a gambling casino in Las Vegas, Nevada, would not amount to 'unlawful activity.'" (Miller, The "Travel Act": A New Statutory Approach to Organized Crime in the United States, 1 Duquesne L.Rev. 181, 194 (1963) (emphasis in original).)

19. This history is outlined in some detail in United States v. Roselli, 432 F.2d 879, 884–888 (9 Cir. 1970).

20. Membership in an organized criminal group is not, of course, an element of an offense under § 1952. United States v. Roselli, 432 F.2d 879, 885 (9 Cir. 1970), cert. denied, 401 U.S. 924, 91 S.Ct. 883, 27 L.Ed.2d 828 (1971), rehearing denied, 402 U.S. 924, 91 S.Ct. 1366, 28 L.Ed.2d 665 (1971). It rests with the courts to determine the reach of § 1952 in a case-by-case manner.

21. See pages 869–873 *supra.*

22. See page 872, *supra.*

23. While appellants contend that the instructions on specific intent were erroneous, we find no such error. See page 877, *infra.*

VFI's license. "A mind intent upon willful evasion is inconsistent with surprised innocence." United States v. Ragen, 314 U.S. 513, 524, 62 S.Ct. 374, 379, 86 L.Ed. 383 (1942). *See also* United States v. National Dairy Corp., 372 U.S. 29, 33, 35, 83 S.Ct. 594, 9 L.Ed.2d 561 (1963); Screws v. United States, 325 U.S. 91, 103, 65 S.Ct. 1031, 89 L.Ed. 1495 (1945). The record here is clear that appellants were not the helpless victims of an unconstitutionally vague statute.[24]

### III. Jury Instructions

#### A. Nevada Statutes and Regulations

Appellants contend that the court below erred in several respects in its instructions to the jury. Certain of these claims concern specific instructions relating to the Nevada statutes. Appellants' objections are based upon a misunderstanding of the government's legal theory of the case. Viewed as a whole, the court's instructions constitute a reasonable construction of § 1952 and the Nevada statutes governing the licensing of gambling operations.

Appellants also argue that it was error to read to the jury, without explanation, N.R.S. § 463.130.[25] But that section is a self-explanatory statement of Nevada legislative policy and is important in understanding the purpose and meaning of the other sections. These Nevada statutes form a unified legislative plan; particular sections cannot be fully understood without relating them to the entire statutory scheme. Therefore, under these circumstances, it was not error to read to the jury sections other than N.R.S. §§ 463.160 and 463.200, the two sections upon which the indictment and information were based.

N.R.S. § 463.300, dealing with voting trust agreements, was also read to the jury. Appellants argue that this was confusing, since the court had earlier instructed the jury that the evidence presented had failed to establish a violation of § 463.300. The court refused appellants' instruction which would have directed the jury to disregard all evidence concerning the voting trust agreement. In light of the court's specific instruction, no further instructions were necessary to prevent the jury from finding a violation of § 463.300. It is also highly unlikely that reading that section in these circumstances confused the jury. *Cf.* United States v. Lookretis, 422 F.2d 647, 651 (7 Cir. 1970), cert. denied, 398 U.S. 904, 90 S.Ct. 1693, 26 L.Ed.2d 63 (1970).

Although conceding that the court properly charged the jury that violations of the regulations of the Nevada State Gaming Commission could not constitute criminal offenses, appellants nevertheless assert that error was committed in instructing that such a violation could be considered as an act in furtherance of a conspiracy. This instruction was proper and necessary in that without it the jury might have thought that it had to disregard completely a violation of the regulations.

#### B. Sending Statutes and Regulations to the Jury Room

Appellants urge that sending the statutes and regulations into the jury room, especially without limiting instructions, was prejudicial error.

24. The question of vagueness was considered before Congress enacted § 1952. Assistant Attorney General Herbert J. Miller, Jr., testified before the House Subcommittee that: "It can hardly be contended that the average American citizen does not know if he is engaged, for example, in 'any business enterprise involving gambling, liquor, narcotics, or prostitution offenses' * * *. Since the bill in addition would require proof of the requisite intent befor a violation would be made out, I believe that the scope of H.R. 6572 in no way threatens the activities or rights of any persons other than the organized criminals at whom it is aimed." "Legislation Relating to Organized Crime," Hearings on H.R. 468 et al., Before Subcommittee No. 5 of the House Committee on the Judiciary, 87th Cong., 1st Sess., p. 336 (1961).

25. See footnote 9, *supra.*

This question is within the sound discretion of the trial judge. United States v. Gross, 451 F.2d 1355, 1358–1359 (7 Cir. 1971); United States v. Bearden, 423 F.2d 805, 813 (5 Cir. 1970), cert. denied, 400 U.S. 836, 91 S.Ct. 73, 27 L.Ed.2d 68 (1970). In this case, the statutes and regulations were extremely complex, and the trial judge may justifiably have believed that it would be better to give the jury the statutes and regulations rather than to have them attempt a reconstruction from notes or from memory. In his effort to avoid confusion, the trial judge did not abuse his discretion.

## C. *Reading Indictment and Information to Jury and Sending Copies to Jury Room*

■ Appellants argue that it was reversible error to read the indictment and information both at the beginning of trial and during the instructions. Given the extraordinary length and complexity of the trial, however, the trial court may properly have judged that a re-reading was required to avoid confusion.[26] The decision to read the indictment to the jury is within the sound discretion of the trial court, and we find no abuse of that discretion here.[27]

■■ The court below also sent to the jury room copies of the indictment and information. That decision is also generally within the discretion of the trial judge. United States v. Murray, 492 F.2d 178, 193–194 (9 Cir. 1973); Souza v. United States, 304 F.2d 274, 280 (9 Cir. 1962). Appellants contend that they should have been advised before closing arguments that the court intended to send the information and indictment. *See* Dallago v. United States, 138 U.S.App.D.C. 276, 427 F.2d 546, 553 (1969). We agree, but the failure to do so here is not prejudicial error.[28] Under all the circumstances of this case, especially the court's cautionary instruction on the use of the indictment and information and the detailed instructions on what could be considered evidence by the jury, we do not find that error prejudicial in any respect.

## D. *Specific Intent*

■ In claiming error in the court's instructions on specific intent,[29] appellants urge us to follow United States v. Stagman, 446 F.2d 489, 492–493 (6 Cir. 1971), and hold that specific intent to violate state law is an element of the offense under § 1952. This Court however, has previously approved an instruction similar to the one given in this case. *See* Turf Center, Inc. v. United States, 325 F.2d 793, 797 and n. 5 (9 Cir. 1963). Moreover, to the extent that *Stagman* requires proof that an accused under § 1952 intended to violate state law *himself,* we find that it conflicts with the clear meaning of the language used in § 1952. As the court in *Stagman* recognized, the intent required in the statute "refers to the entire phrase 'to * * * carry on * * * any unlawful activity.'" 446 F.2d at 492. That phrase does not require specific in-

---

26. The indictment was first read on February 16, 1972, and re-read on April 19, 1972, an interval of more than two months.

27. The court instructed the jury as to the indictment and information: "An Indictment or Information is but a formal method of accusing a defendant of a crime. It is not evidence of any kind against the accused." Reporter's Transcript, Vol. 43, pp. 8736–8737.

28. In United States v. Steed, 465 F.2d 1310, 1316 (9 Cir. 1972), cert. denied, 409 U.S. 1078, 93 S.Ct. 697, 34 L.Ed.2d 667 (1972), the trial court sent the indictment to the jury room upon the request of the jury during its deliberations. Despite the objections of both counsel, the court held that decision was within its discretion. Counsel stipulated that a cautionary instruction could be affixed to the indictment that was to be sent to the jury. We do not read the case to require affixing such an instruction in all cases in which an indictment is sent to the jury.

29. "[I]t is not necessary that the Government prove that the defendants knew that they were violating Nevada law. The specific intent which the Government must show is the intent to facilitate the carrying on of a business enterprise involving gambling in violation of Nevada law." Reporter's Transcript, Vol. 43, p. 8802. See also pages 8755–8757.

tent to violate state law, but rather specific intent to facilitate an activity which the accused knew to be unlawful under state law. This interpretation, apart from its consistency with the literal terms of § 1952, also supports the purposes of that statute in attacking organized crime by furnishing federal help to local authorities in their attempts to control such crime. It would not subject innocent persons to criminal jeopardy in travelling interstate since for a conviction, proof would be required at the least "that the defendant intended with bad purpose" [30] to facilitate the violation of state law.

■ Although the instructions on specific intent, viewed alone, could have been more precise, taking the instructions as a whole, they reasonably informed the jury that they had to find that appellants knew that what they were facilitating was an unlawful activity under state law.

### E. Advice of Counsel

■ As an adjunct to their argument on specific intent, appellants claim that the court should have instructed the jury that reliance on advice of counsel could show a lack of specific intent. Given the evidence in this case, the advice given by counsel was an insignificant factor in the criminal enterprise found by the jury; thus the court below did not err in refusing to give an "advice of counsel" instruction. See United States v. Shewfelt, 455 F.2d 836, 838–839 (9 Cir. 1972), cert. denied, 406 U.S. 944, 92 S.Ct. 2042, 32 L.Ed.2d 331 (1972); Bisno v. United States, 299 F.2d 711, 719–720 (9 Cir. 1961), cert. de-

nied, 370 U.S. 952, 82 S.Ct. 1602, 8 L.Ed.2d 818 (1962).

### F. Kotteakos Instruction

■ Appellants contend that they were entitled to a "multiple conspiracy" instruction following the principle of Kotteakos v. United States, 328 U.S. 750, 767–768, 66 S.Ct. 1239, 90 L.Ed. 1557 (1946). See also United States v. Griffin, 464 F.2d 1352, 1355–1357 (9 Cir. 1972), cert. denied, 409 U.S. 1009, 93 S.Ct. 444, 34 L.Ed.2d 302 (1972). Having carefully reviewed the entire reporter's transcript of trial and all documents in evidence, we find that there is no variance between the allegations of the indictment and information and the evidence presented at trial and that therefore the trial court did not err in not giving a "multiple conspiracy" instruction.

### G. Suppression of Evidence

A letter from appellant Bellanca to Emprise Corporation was not produced by the defense in response to a grand jury subpoena because of a claim of attorney-client privilege. The court gave a general instruction on suppression of evidence, apparently in part on the basis that failure to produce the letter could be evidence of suppression.[31] Appellants also complain of the court's refusal to give an instruction on attorney-client privilege.

■ Even if the giving of the suppression of evidence instruction were error, we find that the weight of other evidence against appellants is such that the error could not have been prejudicial. The court below, moreover, had instructed the jury on the attorney-client privilege during the trial.[32]

30. 446 F.2d at 494.

31. See Reporter's Transcript, Vol. 35, pp. 6944–6948.

32. The issue of attorney-client privilege arose during the testimony of Virgil Wedge. The court instructed the jury that: "There exists what is known as an attorney-client privilege

and it says, in short substance, that when a man goes to a lawyer and tells him sometimes confidential matters that he would want to discuss with a professional man, that that lawyer has the duty of preserving those matters inviolate to public notice and to keep them confidential as long as his client wants him to do so." Reporter's Transcript, Vol. 13, p. 2511.

### H. *Perjurer's Testimony*

██ Appellants also claim error in the court's failure to give a cautionary instruction on the testimony of a perjurer. Their initial proposed instruction referred to the witness, Maurice Friedman, as an admitted perjuror when in fact he had been convicted of perjury and had not pled guilty. Appellants submitted a revised instruction after the instructions conference substituting "convicted" for "admitted", but it was rejected as untimely. Even if this were error, which we do not find, any prejudice resulting from it was cured by the instructions given on prior inconsistent statements [33] and on the weight of the testimony of an informer.[34] These instructions sufficiently alerted the jury to the caution necessary in weighing the testimony of a witness like Friedman. *Cf.* United States v. Evanchik, 413 F.2d 950, 954 (2 Cir. 1969); United States v. Ross, 322 F.2d 306, 307 (4 Cir. 1963), cert. denied, 375 U.S. 970, 84 S.Ct. 490, 11 L.Ed.2d 418 (1964).

### I. *Skimming* [35]

██ Appellants argue that the trial court committed error in not admonishing the jury during instructions that the prosecution's argument about "skimming" should be disregarded as unsupported by evidence and as not appearing in the indictment or information. Whatever prejudice to appellants could have resulted from the prosecutor's argument was cured by the trial court's painstaking instructions on the elements of the offenses charged. The trial judge read the language of the information and indictment to the jury and sent copies of them to the jury room. The jury was fully apprised of the charges against appellants; "skimming" was not one of them.

### IV. *Prejudicial Publicity*

Appellants claim that they were prejudiced by the publicity given their case both before and during trial and that the trial judge failed to take adequate measures to detect and prevent that prejudice. The pretrial publicity consisted mainly of newspaper articles on the case.[36] These articles commented, for instance, upon the alleged ties of appellants to the Mafia and upon the "skimming" allegations of the prosecution.

Appellants also point to several incidents during trial which in their view also led to prejudicial publicity. Newspaper articles referred, for example, to evidence which had not been admitted linking appellants Zerilli and Polizzi to James Hoffa, the former Teamster official, in a prior attempt to invest in a Las Vegas casino. On another occasion a witness mentioned in the absence of the jury that during a previous recorded and transcribed conversation, he "had in mind" Zerilli and Polizzi when he used the terms "Mafia" and "Cosa Nostra." References to this comment appeared in the newspapers. Later a newspaper disclosed the court's ruling at a sidebar conference sustaining the prosecutor's objection to a question asking Polizzi to explain his testimony on cross-examination that he had been falsely accused by the Department of Justice of being in

---

33. "The testimony of a witness may be discredited or impeached by showing that he previously made statements which are inconsistent with his previous testimony." Reporter's Transcript, Vol. 43, p. 8749.

34. "The testimony of an informer who provides evidence against a defendant for pay, or for immunity from punishment, or for personal advantage or vindication, must be examined and weighed by the jury with greater care than the testimony of an ordinary witness. The jury must determine whether the informer's testimony has been affected by interest, or by prejudice against any of the defendants." Reporter's Transcript, Vol. 43, p. 8751.

35. "Skimming" appears to mean misappropriation of casino funds through falsification of accounts by underreporting the funds flowing into the cashier's office and by unrecorded payments from the cashier's office.

36. Appellants also cite the book, *The Godfather*, as a factor, since its storyline includes the infiltration of Las Vegas gambling by Mafia figures.

the Mafia.[37] The prosecutor had mentioned at that sidebar conference surveillance logs of Zerilli and Polizzi disclosing "the whole Mafia organization in Detroit," and the newspaper article referred to that comment. The motion picture *The Godfather* was released during the trial, and a local television personality discussed during his program the book and Zerilli and Polizzi and their alleged links to the Mafia. Finally, after the jury had reached its verdicts, one juror allegedly told defense counsel that other jurors had read newspaper articles on the case during trial and that this had been "devasting to the defendants." Although this juror had been in the courtroom during a hearing on a motion for a new trial, the court refused appellants' request to have him testify but permitted defense counsel to file affidavits. The juror was subsequently unwilling to submit an affidavit, but defense counsel did file an affidavit purporting to state what the juror had said.

 An accused has an unquestioned right to have jurors decide his guilt or innocence who are not biased by what has appeared in the media. In some instances prejudicial publicity before and during trial may be so obvious and overwhelming that an appellate court must overturn a conviction without delving into a detailed analysis of the possibility of prejudice and the judicial action taken to a curb it. *See* Sheppard v. Maxwell, 384 U.S. 333, 349–352, 86 S.Ct. 1507, 16 L.Ed.2d 600 (1966); Estes v. Texas, 381 U.S. 532, 542, 544, 85 S.Ct. 1628, 14 L.Ed.2d 543 (1965); Rideau v. Louisiana, 373 U.S. 723, 726, 83 S.Ct. 1417, 10 L.Ed.2d 663 (1963); Irvin v. Dowd, 366 U.S. 717, 725, 81 S. Ct. 1639, 6 L.Ed.2d 751 (1961). After a review of appellants' evidence and arguments on this question, we do not find that the situation here reached that ex-

treme, and therefore we do not find "bias or preformed opinion" which would require reversal as a matter of law. Beck v. Washington, 369 U.S. 541, 557, 82 S.Ct. 955, 8 L.Ed.2d 98 (1962); United States v. Silverthorne, 430 F.2d 675, 678 (9 Cir. 1970), cert. denied, 400 U.S. 1022, 91 S.Ct. 585, 27 L.Ed.2d 633 (1971). We must now determine the probability of prejudice in this case and whether the court responded adequately to curtail the chance of an unfair trial. Marshall v. United States, 360 U.S. 310, 312, 79 S.Ct. 1171, 3 L.Ed.2d 1250 (1959).

### A. *Pretrial Publicity*

 "[T]he trial judge has a large discretion in ruling on the issue of prejudice resulting from the reading by jurors of news articles concerning the trial. * * * [W]hen pretrial publicity is great, the trial judge must exercise correspondingly great care in all aspects of the case relating to publicity which might tend to defeat or impair the rights of an accused. The judge must insure that the voir dire examination of the jurors affords a fair determination that no prejudice has been fostered." Silverthorne v. United States, 400 F.2d 627, 637–638 (9 Cir. 1968). In a case of *substantial* pretrial publicity, the voir dire must not simply call for the jurors' subjective assessment of their own impartiality, and it must not be so general that it does not adequately probe the possibility of prejudice. 400 F.2d at 638.

If this case were to be considered closely similar to *Silverthorne, supra,* in the seriousness of the question of prejudice from pretrial publicity, there is little doubt that the initial voir dire was not sufficiently probing to meet the *Silverthorne* standards. The trial judge's questions on pretrial publicity were lim-

---

37. The newspaper apparently learned of the ruling when a reporter, without the government's authorization or knowledge, read its copy of the reporter's daily transcript in which the conference outside the presence of the jury was reported. Thereafter the government took action to prevent recurrence of such an event.

ited to two questions addressed to the first prospective panel of jurors[38] and later questions addressed to an individual prospective juror.[39] The answers gave no indication of possible prejudice.

 We find, however, that the pretrial publicity in this case was not substantial enough to have required the trial judge to interrogate the prospective jurors at length about it. The judge was aware of the publicity, and clearly it was his judgment that the pretrial publicity was not a significant danger to a fair trial.[40] His concern seemed greater about the possible effects of publicity during trial. The pretrial publicity in this case does not resemble the situation in Silverthorne v. United States, 400 F.2d 627, 639 (1968). Unless a trial judge clearly has erred in his estimation of the action needed to uncover and prevent prejudice from pretrial publicity, an appellate court should not intervene and impose its estimate. The court closest to the situation can best evaluate the proper way to walk the difficult line between a vigorous voir dire to determine any possible bias and avoidance of creating bias by specific questions which add "fuel to the flames" in suggesting the presence of controversial issues. Beck v. Washington, 369 U.S. 541, 548, 82 S.Ct. 955, 8 L.Ed.2d 98 (1962). The court below did not abuse its discretion by the way it handled the question of pretrial publicity.

### B. Publicity During Trial

 When the possibility of prejudice from publicity arises during trial, the trial court has "the affirmative duty * * * to take positive action to ascertain the existence of improper influences on the jurors' deliberative qualifications and to take whatever steps are necessary to diminish or eradicate such improprieties." Silverthorne v. United States, 400 F.2d 627, 643 (9 Cir. 1968). See also Gordon v. United States, 438 F.2d 858, 872–873 (5 Cir. 1971), cert. denied, 404 U.S. 828, 92 S. Ct. 139, 30 L.Ed.2d 56 (1971), rehearing denied, 404 U.S. 960, 92 S.Ct. 312, 30 L. Ed.2d 279 (1971). The better practice, if there is a clear chance of prejudice, is for the court to interrogate each juror in camera about the possibly prejudicial publicity. Silverthorne v. United States, 400 F.2d 627, 644 (9 Cir. 1968); Coppedge v. United States, 106 U.S.App.D. C. 275, 272 F.2d 504, 508 (1959). The trial judge carries a difficult burden. He is called upon to question the jurors, but repeated questioning could itself be prejudicial in inciting in the jurors "joint or individual curiosity and encourage attempts to read the very newspaper articles sought to be kept from their knowl-

38. "The Court: Have any of you heard anything about the facts of this case except what you have heard in this courtroom today?
 "Prospective Jurors: No.
 "The Court: I take it when you say you haven't heard of it that means you haven't read anything about it either. Is that correct?
 "Prospective Jurors: That's right." Reporter's Transcript of Proceedings of February 15, 1972, p. J–87.

39. "The Court: Have you heard anything about this case in the newspaper or radio?
 "Prospective Juror Schadick: No.
 "The Court: If you are a juror and you do hear something about it will you put aside whatever news that should attract your attention as quickly as you could without consuming it?
 "Prospective Juror Schadick: Yes." Reporter's Transcript of Proceedings of February 15, 1972, pp. J–126—J–127.

40. A trial judge in a noteworthy and controversial case cannot be expected to impanel jurors who have not heard about the case. "In these days of swift, widespread and diverse methods of communication, an important case can be expected to arouse the interest of the public in the vicinity, and scarcely any of those best qualified to serve as jurors will not have formed some impression or opinion as to the merits of the case. * * * To hold that the mere existence of any preconceived notion as to the guilt or innocence of an accused, without more, is sufficient to rebut the presumption of a prospective juror's impartiality would be to establish an impossible standard. It is sufficient if the juror can lay aside his impression or opinion and render a verdict based on the evidence presented in court." Irvin v. Dowd, 366 U.S. 717, 722–723, 81 S.Ct. 1639, 1642, 6 L.Ed.2d 751 (1961).

edge." Silverthorne v. United States, 400 F.2d 627, 643 (9 Cir. 1968). His very questions may disclose or accentuate controversial issues. Unless he has clearly abused his discretion, we shall uphold the trial judge's delicate estimation of the needs of the case of which he has firsthand experience.

■ During his initial voir dire of prospective jurors, the judge indicated that the jurors would not be sequestered but that they would be expected to avoid hearing or seeing anything about the case.[41] One prospective juror was questioned about adherence to that admonition; she indicated that she would find it difficult to follow and was excused. Appellants argue that allowing the jurors to read newspapers with the admonition to avoid stories on the trial after glancing at headlines itself raised enough possibility of prejudice to require reversal. We disagree. The relevant questions are the nature of the headlines and the actions taken by the court to cure any possibility of prejudice.[42]

Early in the trial on February 24, 1972, the court again admonished the jury to avoid any publicity about the case.[43] The very next day, after newspaper stories linking Zerilli and Polizzi to James Hoffa, the court undertook an in camera interrogation of each juror separately, in the absence of all defendants, counsel and other jurors. The judge asked whether they had read the articles and whether they had seen or heard anything about the case in the newspapers, on television, or on the radio. He also gave them another general admonition. Nothing said by any of the jurors during this interrogation revealed a possibility of prejudice from the publicity.[44] We agree with appellants

41. "The Court: I am not so sure that this will happen, but it may. There may be some newspaper attention given this case, or there may be some talk about it on the radio or television. If you are selected as a juror in this case I am going to admonish you that when you leave here and go to your home and pick up the paper, if you should pick it up and see something about this case I am going to admonish you to put the paper down right away and to read no more of that article, because I don't want anything coming to your attention other than that which is directed to you through the rules of evidence that we have and that will come from this court room.

"I will also tell you to blind yourself to the subject on TV and to deafen yourself to the subject on radio if it should happen.

"Are there any of you who if you were a member of the jury in this case would feel that you shouldn't have to obey such admonition at all, and 'I am going to read what I please and listen to what I want to'—would any of you be inclined to do that?

"Prospective Jurors: No.

"The Court: Would you understand that there is a compelling reason for this Court to ask you to insulate yourselves from other information that may come to you through newspapers or through other media about this case, you understand that there is a reason for my doing so?

"Prospective Jurors: Yes." Reporter's Transcript of Proceedings of February 15, 1972, pp. J–87—J–88.

42. Cases cited by appellants are readily distinguishable from this case.

In United States v. Rattenni, 480 F.2d 195, 196 (2 Cir. 1973) (Clark, J.), a juror admitted "her prejudice against Rattenni on the remaining open charges against him as well as on all of the charges against his co-defendants". In United States v. Thomas, 463 F.2d 1061, 1062–1063 (7 Cir. 1972), a juror disclosed that certain jurors had "argued from" a newspaper article which they displayed during their deliberations and that several votes were required before all jurors decided to vote for conviction. In Mares v. United States, 383 F.2d 805, 809 (10 Cir. 1967), cert. denied, 394 U.S. 963, 89 S.Ct. 1314, 22 L.Ed.2d 564 (1969), an article reported a withdrawn guilty plea and an excluded confession, probably the most conclusively prejudicial publicity possible, and the court took no steps to determine the jury's exposure to it.

43. "May I remind the jury once again about the earlier admonition about reading any publicity that may be in the newspapers about this case, or watching any news concerning this case on TV or radio. Please be mindful of the importance of the admonition that I have told you about concerning that." Reporter's Transcript, Vol. 6, p. 1319.

44. The court gave a fair and complete report of the interrogation to the parties and counsel:

"One juror indicated that several days ago he heard on the Long Beach radio station that a jury had been selected in this case, but that

that it would have been preferable to ask each juror about the newspaper carrying the Hoffa story which apparently was in the jury room, but each juror's other answers would have to be willful falsehoods if each had in fact read the article in the jury room. If the jurors had read the story, "[e]ven the most biased argument would be hard put to suggest that all twelve jurors, sworn to try the indictments fairly would deliberately break their oaths by remaining in the box, having read the items, instead of bowing out under the wise protection of the court and saving not only their dignity but their honor." United States v. Carlucci, 288 F.2d 691, 696 (3 Cir. 1961), cert. denied, 366 U.S. 961, 81 S.Ct. 1920, 6 L.Ed.2d 1253 (1961).

On March 9, 1972, after newspaper articles were published referring to appellants and their links to organized crime as discovered by United States Senate investigators, the court declined to question the jurors again, in the belief that new questioning could itself undermine the jury's belief in its own integrity.[45] On March 21, 1972, after the leak of the

ruling at the sidebar conference, the court, having the opportunity to observe on a daily basis the demeanor of the jurors and after expressing his confidence in their ability to obey his admonitions, again declined to interrogate the jurors anew.[46]

■ On April 3, 1972, the trial court on its own motion conducted an in camera questioning of each juror.[47] Again defendants, counsel, and the other jurors were not present. He asked them generally whether they had read, seen, or heard anything in the media about the case. The jurors indicated that they had not. Appellants argue that Juror Foss, whose family was keeping a scrapbook of articles concerning the trial, must have been exposed to publicity surrounding the case. Here is the record:

"The Court: Mr. Foss, you will recall that some time ago I called the jurors in one at a time to ask them if they had read any newspaper articles about this case and because of the length of the trial I thought it wise to emphasize it again and to call them in to ask if they had read any newspaper

---

he had heard nothing else on radio. All the other jurors indicated that they had heard nothing on radio or on TV about the case.

"Mr. Dewey said that he saw the Los Angeles Times in the jury room this morning, but as soon as he saw it he pushed it aside and did not read the paper at all.

"Mr. Ford stated that he had not read either of the articles, but that four or five days ago he saw an article in the paper saying that a jury had been selected in the case.

"Mr. Foss said that he saw the headline in last night's Herald Examiner, but that he did not read the article, and that he did not read the article in the Times.

"Each of the other jurors indicated that he or she had not read either of the articles and had heard nothing on radio or TV. This inquiry includes the alternates.

"I admonished each against reading any future articles and received the promise of each that he would not read any newspaper articles about this case or listen to any account of it on radio or TV.

"Each person was asked if anything had happened to this point to prejudice him or her against any defendant, and each indicated that nothing had.

"I see no reason at this point to declare a mistrial, but if any counsel desires to be orally heard on such a motion I will hear it at a later time in the day." Reporter's Transcript, Vol. 7, pp. 1348–1349.

45. "Now wouldn't you think that if you were on this jury and every second day I came to you and said, now you are not reading any newspapers, are you, wouldn't you think that I had little enough trust in the integrity of these jurors?" Reporter's Transcript, Vol. 16, p. 3152.

46. "[M]y concern is with this jury and my concern is that your clients and the Government will get a fair trial in this case, and I have gone to the efforts that you have just described to admonish the jury time and again and to talk with them individually about their responsibility not to read the newspapers or any accounts of this trial from the newspapers, and I have reason to believe that they are going to obey that admonition because I have impressed upon them the importance of doing so." Reporter's Transcript, Vol. 24, p. 4711.

47. Reporter's Transcript, Vol. 31, pp. 6008–6024.

articles about the case. Have you read any?

"Juror Foss: No. My people cut the articles out of the paper before they give me the paper. Before they bring the paper to me in the morning they cut everything out. They have got it in a scrapbook somewhere.

"The Court: And you will wait until the case is over before you read it?

"Juror Foss: I won't read anything about the case.

"The Court: That is fine.

"Juror Foss: I will decide it on the facts in the courtroom." Reporter's Transcript, Vol. 31, pp. 6010–6011.

The argument is frivolous.

After the verdicts were reached, the trial judge questioned each juror separately in his chambers. He stressed on this occasion whether the term "Mafia" or related terms had been factors in the jury's deliberations.[48] It seems that the terms were discussed briefly at the be-

48. The court's questions and each juror's response relating to the "Mafia" issue were as follows:

"The Court: Now has anything, any mention of the word 'Mafia' or 'Cosa Nostra' or anything like that that may have happened during this trial brought about anything in your thinking that in your opinion led to these verdicts?

"Juror Dewey: No. We threw that out the first day we were in because, we brought it up in our minds whether anybody thought about it, I don't think they are on trial here for that, that is not the question of what we heard, the fact that somebody mentioned the name in there or something like that, there was no evidence to substantiate anything like that anyway, and that isn't what we *looked* at in there."

\* \* \* \* \*

"The Court: All right. You said that on the first day you were in deliberation, as I understood you to say, that the jurors asked each other, did they?

"Juror Dewey: No, I think it was just an informal thing, that we just said, we are going to go by the evidence and forget the statements that were made that didn't have any bearing on the case.

"The Court: And that would have included any reference to Mafia, or Cosa Nostra?

"Juror Dewey: I don't think we got down and said the words, just to the effect that we will stick to the evidence and that was all."

\* \* \* \* \*

"The Court: Do you know that any mention during the trial of the words 'Mafia' or any related term had any effect upon the verdicts that were reached?

"Juror Ford: No, I don't think that that influenced anybody. I think a lot of times these people just think it is really fictional to a great degree, they think it is a bogeyman word and that it is not anything real, that it is exaggerated.

"The Court: Mr. Dewey tells me that at the outset during the deliberations there was some informal talk about whether any of these terms have influenced anybody or brought any trouble to this trial, and he seems to say that there was some general discussion about it so that you could kind of clear the decks on that right away, is that true?

"Juror Ford: Yes. They had, you know, some of them didn't even know what the term meant, what it was all about, some weren't familar with it, some had heard of it but only in something that they had seen or heard."

\* \* \* \* \*

"The Court: I am told that there was some discussion at the outset in the jury room by the jurors about these terms 'Mafia' and related terms and that you decided you were just going to have a discussion about it and get it out of the way.

"Juror Foss: I don't think that that had anything to do with the verdicts.

"The Court: There was the question I was going to ask, whether you think that any of these terms inflamed the jury members in any way. Do you think so?

"Juror Foss: No, I am sure they did not."

\* \* \* \* \*

[For the entire transcript of the interrogation of Juror Palmer, see footnote 50, *infra.*]

\* \* \* \* \*

"The Court: Do you think any mention of the words 'Mafia' or related terms had any influence at all on any of these jurors?

"Juror Beth: No, I don't think anybody even thought anything about it. I know I didn't. It didn't bother me a bit."

\* \* \* \* \*

"The Court: \* \* \* Now there was some discussion during the trial of the word 'Mafia' and related terms.

"Juror Daniels: Sure.

"The Court: Do you think that any discussion of that word adversely affected any of these defendants?

ginning of the jury's deliberations and once during a lunchtime, but the jurors agreed that those terms and issues had not been factors in their decisions. The judge also asked them about their exposure to the book and the motion picture *The Godfather*. Two jurors had read the book, but said that it had not influenced their decisions. He asked all but four jurors general questions about their exposure to newspaper, television, and radio publicity, again without any revelations of possible prejudice.

 Finally, on June 12, 1972, at a hearing on a motion for a new trial, defense counsel told the court of juror Palmer's revelation that other jurors had been reading newspaper stories about the case and that it had been "devastating to the defendants." The court refused defense counsel's request for an immediate examination of jurors Palmer and Dewey who were in the courtroom, but stated that counsel could file affidavits on the matter. Palmer subsequently refused to submit an affidavit, although defense counsel did submit two affidavits.[49] While it may generally be preferable for the trial court to allow such an examination of jurors in order

"Juror Daniels: No, your Honor, because we didn't even during the time of our deliberations, we never did, even the word 'Mafia' was not even entertained or brought forth."

\* \* \* \* \*

"Juror Mirick: \* \* \* [W]e threw out when we first went in there any talk of Mafia \* \* \*.

"The Court: \* \* \* Now do you think that the use of these words 'Mafia' and related words at all influenced any of these jurors?

"Juror Mirick: No, I am sure not."

\* \* \* \* \*

"The Court: The word 'Mafia' and related terms were bandied about a little bit during the time of the trial. Do you think that that inflamed the jury in any way?

"Juror Hoeffler: No.

"The Court: Do you think that it had any adverse effect at all on any of these defendants?

"Juror Hoeffler: Would you say that again?

"The Court: Do you think that the use of that term 'Mafia' and so forth had any adverse effect on these defendants? Did any of you use it, we will say, against any of these defendants or use it in reaching your verdicts?

"Juror Hoeffler: No, sir."

\* \* \* \* \*

"The Court: Now what about during the deliberations, during the course of the trial the word 'Mafia' came up and related terms to that also. Do you think that any mention of that had any adverse effect upon any of these defendants?

"Juror Stroops: No, sir. I don't think we —I know we didn't pay any attention. I think it was just in one thing, it was in Mr. Friedman's just one time, I think in his testimony it was just one time we seen it in the testimony. \* \* \* "

\* \* \* \* \*

"The Court: There was during the trial the mention of the word 'Mafia' and some related terms. Do you think that that adversely affected any of these defendants?

"Juror Montejano: No, your Honor. I think if anything it might have helped us to even try to be really applying ourselves and just go by the facts.

"The Court: Now some have said that at the outset of your deliberations that there was some discussion of the effect of these terms, 'Mafia,' and so forth in the jury room, and you decided to clear the decks concerning it in that manner.

"Juror Montejano: That is right."

\* \* \* \* \*

"The Court: Do you think that the mention during the trial of the word 'Mafia' or any related such term did it have any adverse influence upon any member of this jury to your knowledge against any of these defendants?

"Juror McDonald: No, sir, absolutely not."

\* \* \* \* \*

"The Court: There was a mention during the trial of the word 'Mafia' and some related terms. Do you think that anybody on this jury related any of these terms to any of these defendants?

"Juror Plant: No, sir.

"The Court: Did it in your opinion have any effect at all in the verdicts that were reached?

"Juror Plant: No, sir."

Reporter's Transcript, Vol. 46, pp. 8997–8998, 9000–9001, 9003, 9009, 9011, 9013, 9015, 9018, 9020, 9023, 9026.

49. Counsel for appellant Zerilli submitted the following affidavit, dated June 16, 1972:

"William J. Weinstein, being first duly sworn, deposes and says:

\* \* \* \* \*

"On June 12, 1972, prior to the commencement of the court proceedings in the morning

to dispel any doubts as to the integrity of the jury's deliberations, such action was not required here. The trial judge, after having questioned juror Palmer on three separate occasions during and im-mediately after trial in the privacy of his chambers, could understandably have been skeptical of such a belated attack on the jury's verdicts. The record is not barren on this point,[50] and the court

on the motions for new trial, I saw Alfred Palmer, one of the jurors at the trial of the above case, in the hallway outside the courtroom. We said 'hello' to each other, and I then talked to Agnar Wahlberg, one of the court reporters.

"A few minutes later I went into the courtroom. Mr. Palmer was then sitting in the courtroom. I said 'hello' to him again, and I remarked that the five days of delib-eration of the jury indicated the dedicated work of the jury.

"I was about to walk to the counsel table, but before I could do so Mr. Palmer made substantially the following statement:

" 'We tried to be conscientious. But the newspaper publicity of the trial was dev-astating to the defendants. You can't keep those jurors from reading the newspapers.'

"I then stopped and inquired about this, and I asked Mr. Palmer if he was referring to the Hoffa story.

"His reply was substantially as follows:

" 'More than that. The jury was reading about the case every day.'

"Mr. Palmer further stated that he him-self had not read the newspaper articles con-cerning the case during the trial, but that he had read them after the trial, and that he could now understand how many of the other jurors felt during the trial. He said he felt that the Los Angeles Herald-Ex-aminer was more damaging than the Los Angeles Times.

"Mr. Palmer also stated that the people in his office work hard and then go to Las Vegas and lose their money, and that he thought this was wrong. I then asked him how he felt about horse racing, and he said he thought that horse racing was the same."

50. In his first interrogation of the jurors, the trial judge asked Palmer about his own ex-posure to the media. Palmer answered that he had not read, seen, or heard anything about the case. Reporter's Transcript, Vol. 7, pp. 1330–1332. During the second voir dire, Palmer again failed to mention any problem with the publicity. Reporter's Transcript, Vol. 31, pp. 6011–6012. The post-trial inter-rogation of juror Palmer is set out in full below:

"The Court: Come in, Mr. Palmer.

"Juror Palmer: Thank you, sir.

"I owe you an apology for being the black sheep, the only one that said yes when I should have said no.

"The Court: No apology needed at all.

"Juror Palmer: The count was seven to five and I still feel that if we had had another session we could have come out on it. [This reference is to the jury's failure to reach a verdict as to defendant Polizzi on Count 3 of the indictment. See p. 8987.]

"The Court: My purpose here now is to ask you some questions about the case. Do you think that anything happened out-side of this courtroom during the trial of this case that in any way influenced the ver-dict in the case?

"Juror Palmer: Well, I will put it this way, not that I know of. As far as myself is concerned, no, but as to others I am not too sure.

"The Court: Yes. Now is there anything about that, the leads you to suspect that anything happened?

"Juror Palmer: Well, I would rather hesitatingly say no.

"The Court: Read that answer to me.

"(Record read.)

"Juror Palmer: I think you well know in your experience that when folks get together outside, going to lunch or something like that, you can't very well stop them from taking about it among themselves, you know what I mean, just among ourselves, and I think some of that was done but I don't want to accuse anybody of it.

"The Court: Yes. All right. Now do you think that anybody reached any deci-sions about the case before the case was turned over to the jury?

"Juror Palmer: I don't think so. None were expressed to me, no, sir.

"The Court: Mr. Palmer, there is a pic-ture called The Godfather. Have you seen that picture?

"Juror Palmer: No, sir, I have not.

"The Court: Have you read the book by the same name?

"Juror Palmer: No, sir. In fact, I never heard of it until you mentioned it.

"The Court: Was there any discussion of either the picture or the book in that jury room?

"Juror Palmer: No, sir, not that I know of, not that I heard.

"The Court: Do you think that the men-tion during this trial of any of the terms such as 'Mafia' or related terms had any unfavorable influence on the verdicts that were reached?

"Juror Palmer: Well, to be frank and honest with you, I hope I won't get into

could reasonably have found juror Palmer's disclosure as reported by defense counsel unworthy of belief. Palmer's unwillingness to submit an affidavit strongly supports that judgment.[51]

■ In this case the problem of publicity was not insignificant, but it was a problem that was handled by proper judicial supervision. "The right to publish a prejudicial article does not carry with it the right of an accused to an automatic mistrial. Such an outcome would give to the press a power over judicial proceedings which may not be countenanced." Mares v. United States, 383 F.2d 805, 808 (10 Cir. 1967), cert. denied, 394 U.S. 963, 89 S.Ct. 1314, 22 L.Ed.2d 564 (1969). After our detailed review, we cannot say that there is a serious possibility that the jury was influenced by considerations apart from evidence properly admitted at trial. The

trial judge admonished the jury on at least four occasions to avoid publicity about the case. He interrogated the jurors individually three times. The fact that the jurors discussed the term "Mafia" and related issues does not in itself require reversal. Cf. United States v. Lazarus, 425 F.2d 638, 640–641 (9 Cir. 1970), cert. denied, 400 U.S. 869, 91 S.Ct. 102, 27 L.Ed.2d 108 (1970), rehearing denied, 400 U.S. 954, 91 S.Ct. 233, 27 L.Ed.2d 261 (1970). For appellants' arguments of prejudice and juror Palmer's disclosure to be true, the other jurors would in effect have committed perjury on several occasions and have entered into a conspiracy of silence. The trial judge found that incredible. We agree. "Appellate courts should be slow to impute to juries a disregard of their duties, and to trial courts a want of diligence or perspicacity in appraising the jury's conduct." Fairmount Glass

trouble by doing so, I think some of that was mentioned during the lunch hour between some of the members of the jury.

"The Court: In what respect?

"Juror Palmer: Well, it was just the fact that it came up during the trial, the Chief of Police of Detroit accused some of our defendants of being members of it, they threatened him with suit and the suit was never filed because they thought they couldn't win it, the defendants I mean. Do I make myself clear?

"The Court: Yes, I think so. What you are saying is that during a lunch hour that there was some discussion of the evidence, is that correct?

"Juror Palmer: I was told somewhere that that come out in the local papers during the trial, and I think that was discussed during the lunch hour between some of the members. I don't want to hold up my right hand and swear to that, your Honor.

"The Court: Did you hear it yourself?

"Juror Palmer: Indirectly, yes.

"The Court: What do you mean by 'indirectly'?

"Juror Palmer: Well, they were some distance away from me, that is what I think they were talking about, but I couldn't convict them of it, I heard the word 'Mafia' mentioned and that kind of thing, and that was all, but I don't think there was any prejudice to it as far as that is concerned because it was admitted it was not to be considered in the trial. It was, shall I say, outlawed.

"The Court: Do you think that anybody did consider that in the deliberations in this case?

"Juror Palmer: I don't believe so, no, sir.

"The Court: Any comment or any discussion about it in the deliberations?

"Juror Palmer: No, sir, nothing. I never heard the word mentioned during the deliberation time, no, sir.

"The Court: All right. I think those are the questions that I wanted to ask you. And thank you again.

"Juror Palmer: Let me say it has been a pleasure to work with you. I hope I get a chance to do it again.

"The Court: It has been a pleasure working with you.

"Juror Palmer: Thank you."

Reporter's Transcript, Vol. 46, pp. 9005–9008.

51. A case cited by appellants in support of their contention that juror Palmer's revelations indicate jury bias is easily distinguished from this case. United States v. Thomas, 463 F.2d 1061, 1062 (7 Cir. 1972), involved the disclosure by a juror the morning after the jury had deliberated, and reached a verdict that jurors "who chose to vote for conviction argued from [a newspaper] article which they displayed and to which they repeatedly referred." Here Palmer's disclosure as reported by appellants' counsel came approximately six weeks after the verdict had been reached, and there were good reasons for disbelieving that disclosure.

Works v. Cub Fork Coal Co., 287 U.S. 474, 485, 53 S.Ct. 252, 255, 77 L.Ed. 439 (1933) (Brandeis, J.). "If the mere opportunity for prejudice or corruption is to raise a presumption that they exist, it will be hard to maintain jury trial under the conditions of the present day." Holt v. United States, 218 U.S. 245, 251, 31 S.Ct. 2, 6, 54 L.Ed. 1021 (1910) (Holmes, J.). No reversible error was committed in the trial court's handling of the question of prejudicial publicity; we do not find "that the probability of prejudice arose and was not eliminated." Silverthorne v. United States, 400 F.2d 627, 644 (9 Cir. 1968).

### V. Department of Justice "Mafia" List

The United States Department of Justice in 1969 included appellants Zerilli and Polizzi on a list of known Mafia figures. See 115 Cong.Rec., Part 17, pp. 23440–23441 (August 12, 1969). Appellants contend that the presence of those names on that list was the motivating factor in the prosecution of this case and also that the prosecution made several prejudicial comments, based upon appellants' alleged Mafia connections, to the grand and petit juries.

 Their first point, that their inclusion on the "Mafia list" was the prime motivation for the prosecution, is not supported by anything in the record and is strongly contradicted by the testimony of three government officials prominent in this prosecution.[52]

The next contention, that the prosecution "poisoned" the grand jury proceedings by comments referring to the Mafia, is unsupported by the record or by the authorities appellants cite. The portions of the transcript of the proceedings before the grand jury which appellants quote in their opening brief are not evidence of grand jury bias. "Mafia" is mentioned by the prosecutor in one question. The possible use of force is the basis of four questions referring to appellant Shapiro. One witness is asked whether he is fearful or apprehensive as a result of his testimony. Appellants allege that the grand jury was "repeatedly told" of a prior arrest of appellant Zerilli; and the prosecutor commented on the alleged association of Zerilli and Polizzi with "tough guys, Italians, from New York."

 Appellants have a difficult burden to satisfy in their challenge to the indictment. "An indictment returned by a legally constituted and unbiased grand jury, like an information drawn by the prosecutor, if valid on its face, is enough to call for trial of the charge on the merits. The Fifth Amendment requires nothing more." Costello v. United States, 350 U.S. 359, 363, 76 S.Ct. 406, 409, 100 L.Ed. 397 (1956). A valid indictment does not require support by "adequate or competent evidence." 350 U.S. at 364.[53] See also United States v. Calandra, 414 U.S. 338, 94 S.Ct. 613, 38 L.Ed.2d 561 (1974). Appellants have not demonstrated a rea-

52. The Honorable W. Matthew Byrne, Jr., United States District Judge, and who was United States Attorney in Los Angeles during the initial stages of this case, testified that interviews with Maurice Friedman were "the basis for the commencement of the investigation and the commencement of grand jury investigation regarding the Frontier case." Reporter's Transcript, Vol. 48, p. 9224. He did not recall having ever seen the "Mafia list." Reporter's Transcript, Vol. 51, pp. 9824–9825. David Nissen, chief of special prosecutions in the organized crime and racketeering section of the United States Attorney's office in Los Angeles at the time, also testified that Friedman's information was the basis for the decision to convene a grand jury.

Reporter's Transcript, Vol. 51, p. 10,031. He denied that the "Mafia list" played any role in developing his interest in beginning the prosecution. Reporter's Transcript, Vol. 52, p. 10,220. Wayne W. Hill, a special agent with the F.B.I., also testified that the Friedman interviews provided the basis for initiating the prosecution. Reporter's Transcript, Vol. 49, pp. 9412–9418. He too denied ever having seen the "Mafia list." Reporter's Transcript, Vol. 50, p. 9714.

53. The recent decision cited by appellants, United States v. Estepa, 471 F.2d 1132, 1137 (2 Cir. 1972), condemns the needless use of hearsay testimony before the grand jury and is irrelevant to appellants' claims.

sonable inference of bias on the part of the grand jury resulting from the comments of the prosecutor.[54] *See* Beck v. Washington, 369 U.S. 541, 545–549, 82 S.Ct. 955, 8 L.Ed.2d 98 (1962). "The quantum of evidence necessary to indict is not as great as that necessary to convict. If a grand jury is prejudiced by outside sources when in fact there is insufficient evidence to indict, the greatest safeguard to the liberty of the accused is the petit jury and the rules governing its determination of a defendant's guilt or innocence. And, if impartiality among the petit jurors is wanting, the cure is reversal by the appellate courts." Silverthorne v. United States, 400 F.2d 627, 634 (9 Cir. 1968).[55]

■ Appellants also argue that the "Mafia list" played an impermissible role in the trial. They refer, however, only to the comments of the prosecutor in closing argument that appellants "substituted the corporate resolution for the pistol." [56] There was no express reference to the Mafia in the prosecutor's statement, nor could such a reference be reasonably implied.

VI. *Cross-Examination on Reputation*

Appellants argue that the trial court committed reversible error in allowing the prosecution to cross-examine Polizzi and Zerilli on their reputations. The government contends that the cross-examination was permissible as to Polizzi because he had opened the subject of his reputation on direct examination and as to Zerilli in order to impeach his testimony about why he could not be licensed.

"The price a defendant must pay for attempting to prove his good name is to throw open the entire subject which the law has kept closed for his benefit and to make himself vulnerable where the law otherwise shields him." Michelson v. United States, 335 U.S. 469, 479, 69 S.Ct. 213, 220, 93 L.Ed. 168 (1948). Throughout the presentation of its case, the prosecution avoided raising the issue of the Mafia links of Zerilli and Polizzi in demonstrating that they could not themselves obtain licenses from the Nevada authorities. On direct examination Polizzi testified that the reason why he could not be licensed was that he had a "problem." He never described the specifics of this problem.

For all that the jury knew from Polizzi's direct testimony, his "problem" could have been one of short duration —e.g., insufficient financing—which would not have indefinitely precluded licensing. If so, there would have been no motive for furtive investment. Thus, the nature of Polizzi's "problem" was clearly relevant. And while the trial judge did order Polizzi to answer the question regarding the "problem," he did not order the defendant to use the word "Mafia." Polizzi could have answered the question truthfully and specifically without using the "Mafia" term—for example, he could have said

54. References to "Mafia" and "Italians" are certainly not per se prejudicial. *Cf.* United States v. Lazarus, 425 F.2d 638, 640–641 (9 Cir. 1970), cert. denied, 400 U.S. 869, 91 S.Ct. 102, 27 L.Ed.2d 108 (1970), rehearing denied, 400 U.S. 954, 91 S.Ct. 233, 27 L.Ed.2d 261 (1970).

55. Those cases upon which appellants rely concerned prosecutor misconduct in arguments to the petit jury. Berger v. United States, 295 U.S. 78, 55 S.Ct. 629, 79 L.Ed. 1314 (1935) ; United States v. Cummings, 468 F.2d 274, 277–278 (9 Cir. 1972) ; Hall v. United States, 419 F.2d 582 (5 Cir. 1969). This distinction does not justify, of course, prosecutor misconduct before the grand jury. See A.B.A. Standards Relating to the Prosecution Func-

tion, Approved Draft, 1971, § 3.5(b). It does mean that it takes very substantial evidence of grand jury bias for an appellate court to reverse a conviction because of an indictment returned by an allegedly biased grand jury.

56. "I think I told you at the outset that this is nothing more than sophisticated robbery, sophisticated theft. And these businessmen have learned it is better to use a corporate resolution than a pistol." Reporter's Transcript, Vol. 43, p. 8683.

"In short * * * the principals have learned that a corporate resolution is more deadly and more effective than a pistol, and the chances of apprehension and proof are considerably more difficult." Reporter's Transcript, Vol. 39, p. 7995.

that he understood that he would not be considered a suitable person for a license.

■ Thus, since the general nature of Polizzi's problem was directly relevant and the prejudicial Mafia connection was volunteered by Polizzi, the trial court's ruling was well within its wide discretion in controlling cross-examination and in balancing its probative value against possible prejudice.

This result is even clearer as to Zerilli. The reason why Zerilli could not be licensed was not admissible merely to impeach Zerilli or his attorney—it was directly relevant to Zerilli's guilt. If the reason Zerilli could not be licensed was, as he testified, his ownership interest in a race track, then his testimony of continuing interest in the enterprise because of an intention to invest later might be credible. The race track regulation was apparently unclear and Zerilli could in any event sell his race track interest. However, if the reason he could not be licensed was his reputation, then any hope of investing later would be doubtful since his reputation was unlikely to change. Zerilli therefore had a strong motive to make his investment surreptitiously. Moreover, there was no mention of the Mafia in connection with Zerilli, only of his "reputation," so that the court did not err in permitting the government to cross-examine Zerilli on the reasons why he could not be licensed.

## VII. *Misconduct of the Prosecutor and Trial Judge*

Appellants cite many episodes of what they assert to be misconduct by the prosecutor, sanctioned by the trial judge, which deprived them of a fair trial. After having carefully reviewed each of these assertions, we do not find that they amount to a deprivation of appellants' right to a fair trial. No good would be served by a discussion of each of the points raised, but we shall discuss several representative claims.[57]

■ In his closing arguments, the prosecutor did make comments which could have conveyed the impression that appellants were violent individuals.[58] This question, however, is tied closely to the issue of the influence of the Mafia references on the jury. We have found that the court below carefully handled that issue,[59] and we find that these comments were not so prejudicial to appellants so as to require reversal of the jury's verdicts.

■ Appellants argue that the prosecutor gave his personal opinion of appellants' guilt to the jury and referred to the indictment in this case as supporting him. The prosecutor did mention the grand jury indictment, but he used it to rebut appellants' argument to

57. Those points not discusesd are appellants' contentions that the prosecutor misstated facts and evidence throughout the trial; that the court delayed too long in giving appellants' counsel opportunities to argue their objections to the prosecutor's conduct; that the prosecutor was allowed to argue law, and misrepresent the law, in his arguments to the jury; that the prosecutor improperly asked witnesses to "square" their testimony with that of other witnesses; that the prosecutor intentionally misrepresented to the court what he expected the testimony of a witness would be; that the exhibits were mishandled and that the jury may have had in the jury room exhibits not admitted into evidence; that side-bar conferences were audible to the jury mainly through the fault of the prosecutor; and that the trial judge changed certain "ground rules" to the prejudice of appellants. We have, however, carefully considered each of these points and, based upon our review of the entire record, find them to be without merit.

58. "That is the good old fashioned Chicago type extortion." Reporter's Transcript, Vol. 39, p. 7983. This particular reference was to testimony in the record which indicated perhaps some potential for violence during the events in question in this case. See witness Friedman's testimony of his mysterious and rather frightening trip to Toledo, Ohio. Reporter's Transcript, Vol. 5, pp. 1084–1098. The comment was not proper, however. See also the comments quoted in footnote 56, *supra.*

59. See pages 882–885, *supra.*

the jury that the prosecutor was pursuing in effect a personal vendetta against appellants.[60] The reference to the indictment in these circumstances does not constitute improper argument. *Cf.* United States v. Cummings, 468 F.2d 274, 277–278 (9 Cir. 1972); Hall v. United States, 419 F.2d 582, 587 (5 Cir. 1969). Moreover, the jury was instructed that the indictment and information were not evidence and were merely methods of accusing a defendant of a crime. Reporter's Transcript, Vol. 43, pp. 8736–8737.

■ On four occasions, in ruling on questions addressed to two government witnesses, the trial judge made comments that appear to vouch for the credibility of the witnesses. However, we cannot accept the appellants' assertions of prejudice. They did not object to any of the judge's statements, and they certainly knew how to object when they thought it important to do so. The error, if any, could easily have been corrected, had there been objection. For example, in one instance, at the end of the colloquy, the court said " * * * in any instance the jury is to draw no inference from the questions as bringing any truthfulness to us." Reporter's Transcript, Vol. 2, p. 244. The court, moreover, instructed the jury not to assume from his comments during trial that he held particular opinions about the issues in question and that they

were the sole judges of the credibility of witnesses and of the weight of evidence. *See* United States v. Jackson, 482 F.2d 1167, 1175–1176 (10 Cir. 1973); United States v. Cunningham, 423 F.2d 1269, 1276 (4 Cir. 1970).

■■ Appellants contend that the trial court first received evidence, in the presence of the jury, on the question of the applicable Nevada law, rendering the matter one for the jury's decision, but then at the end of the trial took the issue away from the jury by instructing it as to the state law. The determination of the applicable state law in a case such as this is a question for the court. *Cf.* United States v. D'Amato, 436 F.2d 52, 54 (3 Cir. 1970); United States v. Lyon, 397 F.2d 505, 513 (7 Cir. 1968), cert. denied, 393 U.S. 846, 89 S.Ct. 131, 21 L. Ed.2d 117 (1968). To receive testimony on the question of state law in the presence of the jury is unnecessary, but not prejudicial error unless the combination of the testimony and the court's instructions clearly leave the jury in confusion or in doubt as to the applicable state law. We do not find prejudicial error here.

■ Also cited as error is the trial court's comment that a certain question could be decided if one of the appellants took the stand.[61] This was not an infringement of appellant Bellanca's right against self-incrimination. "[T]he test is whether the language used was mani-

---

60. Defense counsel had argued: "The thing that impressed me and rather frightened me was the display of overwhelming power of the Federal Government if one of their prosecutors gets a theory and takes after you." Reporter's Transcript, Vol. 42, p. 8391.

The prosecutor then argued: " * * * But Mr. Ball has made a statement that I must make one remark to. He says he is worried because a prosecutor gets you on a theory and a statute and he goes after you.

"Not true. Never has been true in the legal system in this country or the body of criminal law that has only been around for 550 years. Never has been true and it is not true during this trial.

"A grand jury passed on this indictment. Not Kotoske. When it is read to you, the judge will read, 'The Grand Jury charges'.

Not Tom Kotoske." Reporter's Transcript, Vol. 43, p. 8692.

Earlier in his argument, the prosecutor had also referred to the indictment in trying to show that the government had been consistent in asserting a legal theory under § 1952. See Reporter's Transcript, Vol. 43, p. 8680.

61. "The Court: I understand what you are trying to show, but I don't know how you can show it by establishing—you are not able to establish the foundation for this document by this witness, as I see it. You may be able to establish it by some other witness, or if your brother takes the stand and testifies you can establish his whereabouts by his testimony.

"Mr. James Bellanca: Then I will withdraw it and save it until then, your Honor." Reporter's Transcript, Vol. 9, p. 1678.

festly intended or was of such character that the jury would naturally and necessarily take it to be a comment on the failure of the accused to testify." Knowles v. United States, 224 F.2d 168, 170 (10 Cir. 1955).[62] No such finding could be reached here. It was an offhand comment which could have had no influence on the jury. This point is an example of a practice appellants have followed many times on this appeal: quoting out of context remarks of the prosecutor and especially the trial judge and supplying an "argument" for reversal by dramatic and hyperbolic language. Appellants argue that after this incident "appellant Bellanca had to take the stand or suffer the possibility of an untoward inference by the jurors." The episode in fact was a pedestrian exchange which, if anything, probably left the jury with the impression that appellants would be able to establish the point through other witnesses, including appellant Bellanca if he testified.

■ Appellants' next point is that the prosecution evaded a prior ruling by the court that it could not offer evidence of prior similar acts by appellants. The court, after hearing the proffered evidence in the absence of the jury, instructed the jury that there was no evidence of prior similar acts and that any comments of the prosecutor on the issue were to be disregarded. In addition, each juror was asked whether the comments had prejudiced them, and each juror said that he had not been prejudiced. The prosecution nevertheless subsequently inquired on cross-examination about prior attempts to invest in Las Vegas. This line of inquiry was permitted by the court for the limited purpose of showing Zerilli and Polizzi's earlier interest in investing in a Las Vegas casino. However, the probative value of that testimony was not great enough to justify its admission in light of the pos-

sibility of confusing the jury which in effect was asked to consider the evidence on one issue but not on another, although the issues of motive and prior similar acts, if not identical, were closely related. We do not find, however, that prejudice to appellants actually resulted in light of other and substantial evidence supporting the verdicts.

The government attempted to use a deposition of Benjamin Reisman, an attorney employed by appellant Emprise, on its redirect examination of Maurice Friedman. The deposition was taken in 1970, before appellants were indicted, during the course of other legal proceedings. Appellant Rooks was later asked on cross-examination by the prosecution whether he had heard the reading of the deposition and whether he knew of the events described in the deposition. On cross-examination of appellant Zerilli, the prosecutor used the deposition again in an attempt to refresh Zerilli's recollection.

■ The use of the deposition cannot be justified by Rule 15 of the Federal Rules of Criminal Procedure since it was not taken at the motion of a defendant, it was taken before the indictment and information here were filed, no order of the court had been obtained, and no notice had been given to the parties. The prosecution argues that it offered the evidence only as to the corporate defendant Emprise. The deposition was taken in connection with legal proceedings against Jeremy Jacobs, the President of Emprise. The court admitted it not on the authority of Rule 15, but rather on the ground that it was a prior statement of a witness in a case where the parties and issues were substantially the same as in the present case. We need not decide whether there was error.[63] Another deposition of Reisman was taken and read into the record without objection, thereby curing any defect

---

62. *See also* United States v. Biondo, 483 F.2d 635, 644–645 (8 Cir. 1973); United States v. Mahanna, 461 F.2d 1110, 1113–1115 (8 Cir. 1972); United States v. Porter, 441 F.2d 1204, 1216 (8 Cir. 1971), cert. denied, 404 U.S. 911, 92 S.Ct. 238, 30 L.Ed.2d 184

(1971); Davis v. United States, 357 F.2d 438, 440–441 (5 Cir. 1966), cert. denied, 385 U.S. 927, 87 S.Ct. 284, 17 L.Ed.2d 210 (1966).

63. We disagree with the government's view that appellants' objection to admitting the

arising from the admission of the first deposition. Appellants' counsel had the opportunity to ask Reisman about his prior statements, thus fulfilling appellants' right to confront adverse witnesses.

If it were error to allow the prosecution to ask appellant Rooks about the first Reisman deposition, there was no possible prejudice.[64] The same is true of the use of the deposition as possibly refreshing Zerilli's memory; the incident was insignificant.[65]

■ The prosecution, as the representative of the government, is expected to follow high standards in conducting its case. "The United States Attorney is the representative not of an ordinary party to a controversy, but of a sovereignty whose obligation to govern impartially is as compelling as its obligation to govern at all; and whose interest, therefore, in a criminal prosecution is not that it shall win a case, but that justice shall be done." Berger v. United States, 295 U.S. 78, 88, 55 S.Ct. 629, 633, 79 L.Ed. 1314 (1935). But during an extensive and fiercely contested trial, we cannot realistically expect perfection. Cf. Lutwak v. United States, 344 U.S. 604, 619, 73 S.Ct. 481, 97 L.Ed. 593 (1953). Upon hindsight, there were things said by the prosecution which would have been better unsaid. But nothing said or done deprived appellants of a fair trial.

■ The main instrument for insuring that the conduct of counsel does not deprive the accused of a fair trial is the

trial judge. In this case the trial judge clearly did his best to give appellants a fair trial. Compare United States v. Dellinger, 472 F.2d 340, 385–391 (7 Cir. 1972), cert. denied, 410 U.S. 970, 93 S. Ct. 1443, 35 L.Ed.2d 706 (1973). Errors were committed, but none so prejudicial, so fatal, either individually or collectively, as to require reversal. "[F]ew, if any judges can altogether avoid words or action, inadvertent or otherwise, which seem inappropriate when later examined in the calm cloisters of the appellate court. But unless such misadventures so persistently pervade the trial or, considered individually or together, are of such magnitude that a courtroom climate unfair to the defendant is discernible from the cold record, the defendant is not sufficiently aggrieved to warrant a new trial." Smith v. United States, 305 F.2d 197, 205 (9 Cir. 1962), cert. denied, 371 U.S. 890, 83 S.Ct. 189, 9 L.Ed.2d 124 (1962). Appellants have failed to make a persuasive showing that their constitutional rights were violated, and our careful review of the entire record does not lead to a reasonable inference that the jury's verdicts were the end result of anything other than an impartial consideration of properly admitted evidence.

VIII. *Production of Jencks Act Statements*

Appellants claim that the prosecution's failure to produce four pretrial statements by its witness, Maurice Friedman, in conformance with the Jencks Act, 18 U.S.C. § 3500, requires a

---

deposition was wtihdrawn when it was agreed that another deposition of Reisman would be taken. The court had made its ruling, and defense counsel then asked about the possibility of taking another deposition.

64. "Q Did you hear the reading of the Ben Reisman deposition that that happened in the spring?
"A No, I don't recall hearing that." Reporter's Transcript, Vol. 24, p. 4602.

65. "Q Mr. Zerilli, does that refresh your recollection whether or not you went up to Emprise or Sportservice to speak with either Mr.

Lou Jacobs or Ben Reisman about the Rooks and Kachinko loan, prior to April 4, 1966?
"A It does not refresh my recollection. I did not go to Buffalo and talk to them about the Alex Kachinko and Art Rooks loan.
"Q Do you recall the testimony, Mr. Zerilli, of Mr. Friedman during this trial indicating that you were there on that occasion?
"A I recall the testimony, yes.
"Q Are you saying that it was inaccurate and not true?
"A Yes, sir, much of it.
"Q How about this point, was it not true?
"A This point was not true, no, sir." Reporter's Transcript, Vol. 26, p. 5211.

reversal. Two of the purported statements are interview memoranda prepared by an assistant United States Attorney; another is a report by an F.B.I. agent of one of the interviews; and the last is the transcript of a tape recording of a conversation between Friedman and one Dr. Victor Lands. The two interview memoranda and the "Lands transcript" were disclosed to appellants after Friedman's cross-examination had begun.

The two interview memoranda and the F.B.I. report are not Jencks Act statements. A written statement falls within that statute only if it is "made by said witness and signed or otherwise adopted or approved by him." 18 U.S.C. § 3500(e)(1). The record shows that Friedman had not signed, adopted, or approved these three written reports. The government attorney who wrote the memoranda took no notes during the interviews and testified that the memoranda were his summaries, conclusions, and interpretations of what Friedman had said. It does not appear that the F.B.I. report differs in these respects. The rationale of the Jencks Act is to provide the defense with material that could impeach a government witness. "We think it consistent with this legislative history, and with the generally restrictive terms of the statutory provision, to require that summaries of an oral statement which evidence substantial selection of material, or which were prepared after the interview without the aid of complete notes, and hence rest on the memory of the agent, are not to be produced." Palermo v. United States, 360 U.S. 343, 352–353, 79 S.Ct. 1217, 1225, 3 L.Ed.2d 1287 (1959). See also Campbell v. United States, 373 U.S. 487,

83 S.Ct. 1356, 10 L.Ed.2d 501 (1963); Rosenberg v. United States, 360 U.S. 367, 369, 79 S.Ct. 1231, 3 L.Ed.2d 1304 (1959); Wilke v. United States, 422 F. 2d 1298, 1299 (9 Cir. 1970).

The Lands transcript presents a more difficult question of construing the Jencks Act, a problem which we find unnecessary to resolve in this case.[66] Assuming for the purposes of argument that it should have been disclosed, we find that the untimely disclosure here was not prejudicial to appellants. Disclosures are required by the Jencks Act only for impeachment purposes.[67] Palermo v. United States, 360 U.S. 343, 345, 79 S.Ct. 1217, 3 L. Ed.2d 1287 (1959); United States v. Harris, 458 F.2d 670, 677 (5 Cir. 1972); cert. denied, 409 U.S. 888, 93 S.Ct. 195, 34 L.Ed.2d 145 (1972). The material in the Lands transcript could not have been used to impeach Friedman's testimony on direct examination. Though a question of inconsistency perhaps did arise with Friedman's testimony on cross-examination, appellants did then have the transcript. Indeed Friedman was questioned about it on recross-examination.[68] Cf. United States v. Scaglione, 446 F.2d 182, 184 (5 Cir. 1971), cert. denied, 404 U.S. 941, 92 S.Ct. 284, 30 L.Ed.2d 254 (1971). The prosecution is obligated to disclose to the defense statements falling within the Jencks Act regardless of anyone's perception of the utility of the statements for impeachment. But if, upon review, a failure to disclose appears clearly to be harmless and is not a willful avoidance and egregious dereliction of the prosecutor's statutory obligation, then a court need not invoke the drastic remedies of striking testimony or calling a mistrial as provided by 18

66. Prior to 1970, the Lands transcript would clearly not have been within the Jencks Act. 18 U.S.C. § 3500(e)(2) then included only statements made "to an agent of the Government." The 1970 amendment eliminated that phrase, but the brief legislative history gives no hint of the Congressional intention behind the change. 2 U.S.Code Cong. & Admin.News p. 4017 (1970).

67. Thus appellants' additional complaint of prejudicial surprise with respect to one of Friedman's answers on cross-examination, that he had told someone several years before of hidden interests in VFI, has no merit under the Jencks Act since that Act was not intended to protect against surprise but rather for impeachment purposes.

68. See pages 894–896, infra.

U.S.C. § 3500(d). _Cf._ United States v. American Radiator & Stand. San. Corp., 433 F.2d 174, 203 (3 Cir. 1970), cert. denied, 401 U.S. 948, 91 S.Ct. 928, 28 L. Ed.2d 231 (1971); Pierce v. United States, 414 F.2d 163, 169 (5 Cir. 1969), cert. denied, 396 U.S. 960, 90 S.Ct. 435, 24 L.Ed.2d 425 (1969).

## IX. *The Lands Transcript*

The Lands transcript is a transcription of a tape-recorded conversation between Maurice Friedman and one Dr. Victor Lands in 1967. During that talk, Friedman said in reference to the attempt to secure a Nevada gambling license for VFI:

> "There are thirty-two people who have invested three and a half million dollars coming before this Commission, all of whom have been approved at least by a majority of this three-man Board. I told you that we feel pretty good except that our lawyer is very, very nervous, and he understands through the grapevine that we are going to have one hell of a time—the thirty-two of us. The Mafia, Casa [*sic*] Nostra—everything's going to come out. This is a public hearing. The press will know."

On cross-examination Friedman testified that he had stated in 1967 that there were hidden interests in VFI. The court then ordered the prosecution to disclose the Lands transcript. With the jury absent, Friedman verified the accuracy of the transcript. He said that in using the terms "Mafia" and "Cosa Nostra" he was referring to appellants Zerilli and Polizzi. He also testified that he was referring to hidden interests in VFI when he said to Lands "everything's going to come out." Upon objection by the defense, the transcript was not admitted as evidence, but the court did permit testimony about the Lands conversation. The court, in an understandable effort to avoid any possible prejudice to appellants Zerilli and Polizzi, ordered Friedman not to use the terms "Mafia" and "Cosa Nostra" in his testimony before the jury. On redirect examination, Friedman testified that he had mentioned to Lands that Zerilli and Polizzi held hidden interests in VFI. On recross-examination Friedman admitted that in the Lands conversation he had not used the words "hidden interests" nor referred specifically to any of appellants.

■ Although the trial court clearly had the best of motivations in its handling of the Lands transcript question, preventing prejudice to appellants from the use of the terms "Mafia" and "Cosa Nostra," it did commit error. Because of the vagueness of the terms used, the probative value of the Lands transcript in this case was insubstantial and was clearly outweighed by the possible prejudice arising from the terms "Mafia" and "Cosa Nostra" and, in an attempt to eliminate that possibility, by the danger of allowing testimony deviating from and therefore misrepresenting the actual terms used in the transcript. The court thus should not have admitted any testimony referring to the Lands transcript.

Appellants argue that they were seriously prejudiced by this error. They characterize this episode as a purposeful distortion of the Lands transcript, a falsification of the record, which resulted in the admission of testimony which is conclusively demonstrated to be false by the transcript itself and admitted to be false by the witness. We disagree. The trial court did not order Friedman to substitute "Zerilli" and "Polizzi" for "Mafia" and "Cosa Nostra." Friedman was instructed only not to use the latter terms. At the most the witness may have misunderstood the court as suggesting such a substitution.[69] Moreover, the

---

69. "The Court: Now, Mr. Friedman, it is my purpose to avoid your use of either of those terms ['Mafia' and 'Cosa Nostra'] in the hearing of the jury.

"Mr. Friedman: I understand, sir.

"The Court: Because of the possible prejudices that might result.

"The Witness: Yes, sir.

Lands transcript did not contradict Friedman's testimony, as appellants argue. Nor did it confirm that testimony, as the government urges. The Lands transcript and Friedman's testimony were simply not expressly inconsistent. Friedman could, as he did in the absence of the jury, have commented on what he meant by some of the terms he had used in talking to Lands. If he had been permitted to say to the jury that, in using "Mafia" and "Cosa Nostra", he was referring to Zerilli and Polizzi, his testimony would clearly have had a strong impact on the jury adverse to appellants. As it was, his testimony was less precise on this point [70] and was heavily qualified on recross-examination.[71] In light of the substantial evidence in the record supporting appellants' convictions, we do not find that the error in handling the Lands transcript was so prejudicial as to require reversal.

We find that, in light of all of the evidence of record, appellants also did not suffer prejudice from the government's argument to the jury concerning the Lands transcript, and that the court's response to the jury's request for a reading of the testimony about the Lands conversation was not an abuse of its discretion.[72] United States v. Baxter, 492 F.2d 150, 175 (9th Cir. 1973); United States v. De Palma, 414 F.2d 394, 396–397 (9 Cir. 1969), cert. denied,

---

"The Court: Do you understand that you are not to use either of those terms in any reference that you are called upon to make when referring to this document?

"The Witness: I understand, sir.

"The Court: Is there a manner that you can state names that you intended referring to at the time you were speaking in this document for those offensive words?

"The Witness: The gentlemen that I understood were Mr. Shapiro's associates, yes, sir." Reporters Transcript, Vol. 10, pp. 1981–1982.

70. "Q Isn't it a fact that you told Dr. Lands on that date that certain hidden interests in that casino were going to come out?

"A Words to that effect, yes, sir.

\* \* \* \* \*

"Q When you used the phrase 'hidden interests,' talking to Dr. Lands, to whom did you refer?

"A To Mr. Shapiro's partners from Detroit.

"Q Who?

"A Mr. Zerilli and Mr. Polizzi." Reporter's Transcript, Vol. 10, p. 2000.

71. "Q So that to put it right on the line, Mr. Freidman, you weren't trying to tell Dr. Lands that there was a hidden interest in the Frontier Hotel, were you?

"A No, I was trying to tell Dr. Lands why I was investigated in the Friars Club case.

"Q And you weren't trying to tell Dr. Lands, were you, that either Mr. Polizzi or Mr. Zerilli had any hidden interest in the Frontier Hotel, were you?

"A No, I wasn't.

"Q And, in fact, you did not mention hidden interest or Mr. Polizzi's name or Mr. Zerilli's name or Mr. Shapiro's name or any of those defendants' names in your conversation with Dr. Lands, is that correct?

"A No, I didn't sir.

"Q And you didn't intend to mention any of their names to Dr. Lands, did you?

"A No, sir." Reporter's Transcript, Vol. 10, p. 2036.

72. The court did not deny the jury's request. The jury did not renew its request after the court gave its cautionary remarks:

"Before I agree to having it reread to you, I want to be certain that a rereading of any testimony is deemed important by the jury at this time to assist you in your deliberations. The reason for that is that we like very much to have you depend upon your own memory of the evidence and testimony in this case and not to have any testimony reread. We feel that to pick out certain portions of the testimony is very probably to unduly emphasize that testimony. At the same time I can conceive that a situation may have arisen during your deliberations that makes you feel rather compelled that the testimony on certain portions of the testimony ought to be reread to you, and if you feel that you would be assisted in your deliberations by a rereading of the testimony I will order that it be done.

"On the other hand, if you feel that you can continue with your deliberations successfully without a rereading of any of the testimony and depending upon your memory of it, I would prefer that, and I think counsel would too." Reporter's Transcript, Vol. 46, pp. 8963–8964.

Appellants' counsel also object to the implication arising from the court's statement that defense counsel concurred in the court's preference. That the court's comment could have had some profound impact on the jury is frivolous speculation.

396 U.S. 1046, 90 S.Ct. 697, 24 L.Ed.2d 690 (1970).

## X. *Concealment of Prosecution Promises of Leniency*

 Appellants contend that the prosecution failed to disclose its agreements with or promises of leniency to its key witness, Maurice Friedman, as required by Giglio v. United States, 405 U.S. 150, 92 S.Ct. 763, 31 L.Ed.2d 104 (1972). Friedman, serving prison sentences concurrently for three federal convictions, had his sentences modified after appellants' convictions and was released from prison. The prosecution did disclose a promise to Friedman that his testimony in this case would be called to the attention of the Parole Board, but maintained that no other promises were made. Appellants argue that the prosecution did also promise to urge the reduction of Friedman's sentences and stipulated that Friedman's motions for modification of sentence could remain submitted but undecided until after the trial in this case.[73] Appellants, however, do not argue that express agreements were reached, but rather that there was an implicit mutual understanding that the prosecution would try to help Friedman.

 Having reviewed the arguments and evidence presented by appellants on this point, we do not find that they establish undisclosed promises by the prosecution.[74] The prosecution did disclose a promise to inform the Parole Board of Friedman's testimony. This disclosure alerted the defense and the jury to the possibility that the testimony was motivated by self-interest. *Cf.* United States v. Sidman, 470 F.2d 1158, 1165 (9 Cir. 1972). The trial court then instructed the jury specifically on carefully weighing the testimony of "an informer who provides evidence against a defendant for pay, or for immunity from punishment, or for personal advantage or vindication."[75] Defense counsel did cross-examine Friedman about his motive for testifying. Finally, the pending motions for modification of sentence were public records, available to the defense, and could have been the basis for cross-examining Friedman.

I concur in the portions of this opinion prepared by Judges Browning and Duniway.

### BROWNING, Circuit Judge:

I concur in the portions of this opinion prepared by Judges Renfrew and Duniway.

## XI. *Unitary Crime Contentions*

 Appellants argue that "this case concerns a unitary event—the maintenance of Vegas Frontier Inc. from

73. Appellants contend that the federal judges who modified Friedman's sentences violated Rule 35 of the Federal Rules of Criminal Procedure. Appellants' position is unmeritorious. This Court, in a decision construing Rule 35 in its form prior to amendment in 1966, ruled that it required a motion for reduction to be made within 60 days and not final action on the motion within that time. Leyvas v. United States, 371 F.2d 714, 719 (9 Cir. 1967). The 1966 amendment increased the time limit to 120 days. There is authority for appellants' position that the 120-day limit also applies to judicial action. *Cf.* 8A J. Moore, Federal Practice ¶ 35.02 [2], pp. 35–6, n. 10.1 (2d ed. 1973). We do not feel, however, that the amendment necessitates a change in the *Leyvas* ruling. *See* Irizzary v. United States, 58 F.R.D. 65, 67 (D.Mass.1972): "The 120 day period is technically not the time within which the motion may be made, but is rather the time within which the court may act. * * * However, as a matter of practice, the requirement has been interpreted to permit a court to act upon a motion as long as the motion is made within that period."

74. The evidence consists of the government's stipulations in continuing the motions for modification and the modifications after appellants' convictions, a statement during a post-trial hearing in this case by Assistant U.S. Attorney Nissen that he had told Friedman's attorney that Friedman's cooperation would be called to the attention of "the court or whatever appropriate authority it would be" (Reporter's Transcript, Vol. 51, p. 10,173), and the affidavit of Friedman's former custodian that Friedman had told him that the government had said that Friedman would be released after testifying in this case.

75. See footnote 34, *supra.*

July 27, 1967 to November 27, 1967," and therefore conviction and punishment on a count charging conspiracy and several counts charging substantive offenses was improper.[1] The argument includes two propositions: that Congress did not intend to make conspiracy to violate 18 U.S.C. § 1952 a separate crime from the substantive offense; and that Congress did not intend to allow prosecution as a separate offense of each of several acts of travel where the illegal intent during each act related to the same unlawful activity. Neither proposition has merit.

### A.

"The distinctiveness between a substantive offense and a conspiracy to commit it is a postulate of our law. 'It has been long and consistently recognized by the Court that the commission of the substantive offense and a conspiracy to commit it are separate and distinct offenses.'" Callanan v. United States, 364 U.S. 587, 593, 81

S.Ct. 321, 325, 5 L.Ed.2d 312 (1961), *quoting* Pinkerton v. United States, 328 U.S. 640, 643, 66 S.Ct. 1180, 90 L.Ed. 1489 (1946). Accordingly, unless there is specific language to the contrary, Congress presumably intended to permit punishment as separate offenses of both the substantive crime and a conspiracy to commit it. 364 U.S. at 594–595. There is no such language here, in either the statute[2] or legislative history.[3]

### B.

Turning to the second proposition, the language of the statute seems unambiguous. The offense defined is an act of travel or use of an interstate facility, with the requisite intent, plus subsequent performance of another act of the kind specified in the statute. Appellants argue, however, that the legislative history indicates that section 1952 was directed at a "course of conduct," and therefore various acts of travel in furtherance of a single "unlawful activity," 18 U.S.C. § 1952(b), should be held to

[1]. The argument does not apply to Emprise Corporation, Rooks, or Giordano, who were each charged and convicted only of conspiracy. The other four defendants were each convicted and sentenced for conspiracy and more than one substantive count. The jail terms were concurrent, but separate fines were imposed on each defendant on the conspiracy count and at least one substantive count. Therefore, each of these defendants was affected adversely by the separate convictions, and the current sentence doctrine is not applicable. *See* Benton v. Maryland, 395 U.S. 784, 89 S.Ct. 2056, 23 L.Ed.2d 707 (1969); United States v. Tucker, 435 F.2d 1017 (9th Cir. 1970).

[2]. *See* pages 869–871 *supra* for a discussion of the statute.

[3]. There is no constitutional bar to separate convictions and sentences for the substantive offenses defined by § 1952 and for conspiracy to commit that offense. Nolan v. United States, 423 F.2d 1031, 1047–1048 (10th Cir. 1970). "Only if the substantive offense and the conspiracy are identical does a conviction for both constitute double jeopardy." Pereira v. United States, 347 U.S. 1, 11, 74 S.Ct. 358, 364, 98 L.Ed. 435 (1954). An agreement or common course of conduct among two or more persons is not an essential ele-

ment of the substantive offense under § 1952: The travel required by § 1952(a) might be accomplished by only one person, and the "business enterprise" required by § 1952(b)(1) also might be conducted by an individual. True, both the legislative history (*see* United States v. Roselli, 432 F.2d 879, 886 n. 8 (9th Cir. 1970)), and case law (*see, e. g.*, United States v. Donaway, 447 F.2d 940, 944 (9th Cir. 1971)) indicate that § 1952 is not directed against casual and isolated instances of illegal conduct. But neither suggests that the substantive crime requires the participation of a group of people.

Further, the conspiracy alleged here is not merely an agreement to violate state law but an agreement to travel interstate with the intent to promote certain violations of state law. It is distinct from the joint activity that might be involved in running the business enterprise mentioned in § 1952 even if the "business enterprise" language were construed to require more than a sole proprietorship.

Nor is there any constitutional bar to conviction for both conspiracy and 18 U.S.C. § 2, the aiding and abetting statute underlying the conviction of some of the defendants on some of the substantive counts. United States v. Valencia, 492 F.2d 1071 (9th Cir. 1974); Pereira v. United States, 347 U.S. 1, 11–12, 74 S.Ct. 358, 98 L.Ed. 435 (1954).

constitute only one crime. But "the 'course of conduct' referred to in the . . . legislative history of Section 1952 refers to the nature of the business promoted or facilitated—and not to the essence of the federal offense, which is 'travel.'" United States v. Teemer, 214 F.Supp. 952, 958 (N.D.W.Va.1963),[4] *quoted with approval* in Katz v. United States, 369 F.2d 130, 135 (9th Cir. 1966).

No appellate court appears to have discussed the proper unit of prosecution under section 1952,[5] but similar federal statutes making it a crime to use interstate transportation or communications facilities in aid of illegal purposes have been construed to permit prosecution of each use of such facilities as a separate offense. *See, e. g.,* Sanders v. United States, 415 F.2d 621, 626–627 (5th Cir. 1969); Katz v. United States, *supra*; Mitchell v. United States, 142 F.2d 480 (10th Cir. 1944). The cases upon which appellants rely (Braverman v. United States, 317 U.S. 49, 63 S.Ct. 99, 87 L.Ed. 23 (1942); United States v. Universal C.I.T. Credit Corp., 344 U.S. 218, 73 S.Ct. 227, 97 L.Ed. 260 (1952); Bell v. United States, 349 U.S. 81, 75 S. Ct. 620, 99 L.Ed. 905 (1955), and Rewis v. United States, 401 U.S. 808, 91 S.Ct. 1056, 28 L.Ed.2d 493 (1971)) are inapposite.[6]

■ In view of the plain import of the language of section 1952, the absence of any contrary indication in the legislative history,[7] and the construction

---

4. Judge Paul continued, 214 F.Supp. at 958:
 The phrase seems to refer to the fact that the Act was designed to attack an entrenched operation rather than a sporadic poker game or a floating crap grame. No act of travel is to be deemed unlawful unless the enterprise is a continuing one; but once the continuity of the enterprise is established, any act of travel, with the requisite intent and the subsequent participation, would seem to be a separate offense, even if the travel is a daily or regular event, and thus, perhaps, a "continuing" activity. If this is the plain and literal meaning of the Act, it is within the power of Congress to make each act of travel a unit of prosecution. See, e. g., Mitchell v. United States, 142 F.2d 480 (10th Cir., 1944); and this, in spite of the distinguishable cases of United States v. Universal CIT Credit Corp., 344 U. S. 218, 73 S.Ct. 227, 97 L.Ed. 260 (1952), and Bell v. United States, 349 U.S. 81, 75 S.Ct. 620, 99 L.Ed. 905 (1955).

5. Separate convictions and sentences for individual acts of travel in violation of 18 U.S.C. § 1952 have been affirmed without discussion of the issue raised here. *See, e. g.,* United States v. McGowan, 423 F.2d 413, 416 (4th Cir. 1970).

6. The issue in *Braverman* was whether a single agreement to commit several criminal acts constituted one or several conspiracies. In the present case only one conspiracy was charged. *Bell* held that a single act of transporting two women interstate at the same time was one violation of the Mann Act. In the instant case, each substantive charge involved a separate act of travel on a different day. There was no attempt to carve several offenses out of a single transaction.

*Universal C.I.T.* is somewhat closer on its facts. As the Court pointed out, however, there was specific evidence in the legislative history of the Fair Labor Standards Act that that Congress did not intend each breach of the statutory duty with respect to minimum wages and overtime owed to each employee during each work week to be treated as a separate crime. 344 U.S. at 222–224. Also, the language of the Act was ambiguous as to the proper unit of prosecution. If not construed to limit prosecution to an entire course of conduct, no limit at all was imposed on the number of crimes that could be charged. Here, the statute is unambiguous; it is explicitly directed at acts of travel and use of interstate facilities, and the prosecution can charge only as many separate crimes as there were separate acts of travel or use of interstate facilities. Where the command of the statute as to the unit of the offense is clear, there is no room for application of the so-called "rule of lenity" of the *Bell* case. *See* Callanan v. United States, 364 U.S. 587, 596, 81 S.Ct. 321, 5 L.Ed.2d 312 (1961). It is true, as appellants point out, that the Supreme Court applied the "rule of lenity" to § 1952 in support of the ruling in *Rewis*, 401 U.S. at 812, that interstate travel by patrons of a gambling establishment did not violate the Act. But the Court premised this application upon a determination that there was an ambiguity in the language of § 1952 relating to persons covered. 401 U.S. at 811. There is no such ambiguity with respect to the unit of the offense.

7. Congress may well have concluded there was a separate social interest in deterring each act of travel in furtherance of an illegal enterprise: each successive trip may increase the success of the illegal activity, and a decision

given comparable statutes over the years, we conclude that each act of travel may be treated as a separate violation of section 1952.

## XII. *Venue*

Appellants raise two venue-related claims. They contend venue was improperly laid in the Central District of California as to some of the substantive counts.[8] They also contend the trial court abused its discretion by denying motions under Federal Rule of Criminal Procedure 21(b) to transfer the proceedings to Detroit or Las Vegas.

### A.

Appellants argue venue was improperly laid as to certain substantive counts for two reasons. First, relying on United States v. Bozza, 365 F.2d 206 (2d Cir. 1966), they argue that the act of carrying on, or distributing the proceeds of, unlawful activity, required to complete an offense under section 1952, did not occur in the Central District of California, though travel with the requisite intent did. Second, they argue that some of the defendants in each count were charged not with themselves traveling but with aiding and abetting the travel of others. Again, appellants rely on *Bozza*: "Congress seems to have been content with venue where the defendants' own accessorial acts were committed or where the crime occurred, without providing still another where the accessorial acts of agents took place." 365 F.2d at 221.

But in *Bozza*, the offense related to the offense of receiving stolen stamps. As the *Bozza* court pointed out, this is not "a continuing offense which is 'held, for venue purposes to have been committed wherever the wrongdoer roamed'

. . . .", (*quoting* Travis v. United States, 364 U.S. 631, 634, 81 S.Ct. 358, 5 L.Ed.2d 340 (1961)) but rather is a "'single act which occurs at one time and at one place in which only it may be tried, although preparation for its commission may take place elsewhere'" (*quoting* Reass v. United States, 99 F.2d 752, 754 (4th Cir. 1938)). 365 F.2d at 220.

In contrast, the offense under section 1952 is one "involving . . . transportation in interstate . . . commerce," which by express provision of the general venue statute, "is a continuing offense and . . . may be . . . prosecuted in any district from, through, or into which such commerce . . . moves." 18 U.S.C. § 3237(a). *See* United States v. Guinn, 454 F.2d 29, 33 (5th Cir. 1972); *cf.* United States v. Barnard, 490 F.2d 907, 911 (9th Cir. 1973).

Thus, a defendant can be prosecuted for traveling in violation of section 1952, or for aiding and abetting such travel, in any district in which the travel occurred.

### B.

Whether the proceedings should have been transferred is an entirely separate question. Rule 21(b), Federal Rules of Criminal Procedure, permits transfers "[f]or the convenience of parties and witnesses, and in the interest of justice." Since the decision as to whether to grant such a transfer "must largely rest in the sound judicial discretion of the trial judge," Wagner v. United States, 416 F.2d 558, 562 (9th Cir. 1969), our review is limited to whether that discretion was abused. We conclude it was not.

---

not to make a given trip for fear of additional penal consequences could therefore limit the harm to society § 1952 is intended to prevent. *Cf.* Irby v. United States, 129 U.S.App.D.C. 17, 390 F.2d 432, 434 (1967) (en banc).

8. Appellants do not attack venue on the conspiracy count. "[A]n overt act committed in

the course of a conspiracy which occurs in a district gives rise to jurisdiction to prosecute the conspirators in that district." United States v. Barnard, 490 F.2d 907, 910 (9th Cir. 1973). Several consequential overt acts are alleged to have occurred in the Central District of California.

Appellants' first motion requested a transfer to Detroit; Las Vegas was also mentioned as a proper venue for trial, but the motion did not request transfer there. In support of their motion, appellants pointed out that most of the appellants and many of the anticipated defense witnesses lived in the Detroit area, and that much of the conduct relevant to the charges occurred there. But relevant conduct had occurred in many places, including the Los Angeles area and nearby Las Vegas, where the business enterprise that defendants allegedly sought to control was located. Nevada law was important to the case, as appellants argued. The relevance of this circumstance is obscure; in any event, it scarcely favored trial in Detroit as against Los Angeles. Both government and defense witnesses were widely dispersed, but 10 of the 31 persons on the government's list of anticipated witnesses resided in the Los Angeles area. The criminal calendar in the federal district court in Detroit was seriously delayed; the Los Angeles calendar, on the other hand, would permit the early trial for which appellants had repeatedly called. This consideration, admittedly relevant, see Platt v. Minnesota Mining & Manufacturing Company, 376 U.S. 240, 243–244, 84 S.Ct. 769, 11 L.Ed.2d 674 (1964), appears to have swung the balance.

On the basis of the information before the trial court, the decision on the first motion seems entirely reasonable. Appellants' residence was a factor to be considered, but was not controlling. Platt v. Minnesota Mining & Manufacturing Company, supra, 376 U.S. at 245–246; Jones v. Gasch, 131 U.S.App. D.C. 254, 404 F.2d 1231, 1240 n.43

(1967). The considerations for and against a transfer seemed fairly balanced, or at least not so clearly weighted against Los Angeles as the trial forum as to overcome the substantial interest in avoiding the delay that would have followed transfer to Detroit's congested calendar.

Appellants' main argument is not that the court abused its discretion in the balance it struck on the facts before it on the first motion. Rather, appellants assert that "the prosecution misrepresented to the court that numerous of its witnesses would be Los Angeles area residents, and that Detroit witnesses desired by appellants would be called by the prosecution itself, thereby obviating some of the prejudice to the defense of a distant trial."

The trial judge was under no misapprehension regarding the Detroit witnesses when he ruled against the initial motion to transfer; the government had advised the court it did not intend to call more than one or two witnesses from Detroit. It is true that many of the Los Angeles witnesses on the government's first list disappeared from the second list, filed several months later. But it is hardly surprising that the prosecution's plans with respect to witnesses changed in the course of preparing this complex case for trial, particularly since government counsel who prepared the first list had been replaced by new government counsel.[9] Appellants' forecasts regarding the number and residence of their witnesses turned out to be no more reliable than the government's.

Several months after denial of the initial transfer motion, both sides filed new witness lists. The prosecution

9. A situation could arise where the prosecution's representations to the judge were so far from the mark that they could only be treated as submitted in bad faith to improperly prevent a change of venue. In such a situation, we would look beyond the information presented to the trial judge in determining whether denial of transfer was within the judge's discretion, since the trial judge has a responsibility to pierce the prosecution's representations and assure that they are made in good faith. And, if the transfer were initially denied on the basis of prosecution information later shown to have been submitted in bad faith, the trial judge would be obligated to view a renewed motion as if it were an original one, without requiring the especially strong showing that may be required to support a later motion. See note 10 infra.

dropped most of its Los Angeles witnesses and added a number from Las Vegas. The defense renewed its motion for change of venue, this time pressing for transfer to Las Vegas. It appeared, however, that the condition of the criminal docket in Las Vegas was such that a reasonably speedy trial could not be obtained, whereas trial in Los Angeles was imminent. The trial court denied the renewed motion both on this ground and because the witnesses then expected to be called resided throughout the country.

 This was not an abuse of discretion. It is proper to require a greater showing of inconvenience when a change of venue is sought late in proceedings.[10] As the trial court observed, there was no "ideal place for the holding of this trial." Wherever the trial was held, both sides would bear significant transportation and lodging expenses. Moreover, most of the Las Vegas witnesses were government witnesses; since the government appeared willing to pay the expense of transporting them, it is hard to see how defendants would be more inconvenienced by trial in Los Angeles than in Las Vegas. The improbability of a speedy trial in Las Vegas was a factor entitled to great weight, especially since one defendant had already moved for dismissal on speedy trial grounds.

The motion for change of venue was renewed a third time, after yet another set of witness lists was filed. The trial judge reiterated his belief that only compelling reasons could justify transfer when trial was imminent. For the reasons stated, this final denial was not an abuse of discretion.

### XIII. *Giordano's Severance Motions*

Appellant Giordano complains that the trial court abused its discretion in denying his motions for severance under Rule 14, Federal Rules of Criminal Procedure, submitted both before and during trial.

 Denial of Giordano's pretrial severance motion was clearly correct. Although Giordano was indicted on only one count, that count charged conspiracy. For obvious reasons, a joint trial is particularly appropriate where conspiracy is charged. Davenport v. United States, 260 F.2d 591, 594 (9th Cir. 1958). *See* American Bar Association, Standards Related to Joinder and Severance 39 (Approved Draft 1968).

 The government represented that Giordano was among the "leaders" in the unlawful scheme and furnished the court with a summary of the evidence it expected to offer linking Giordano to the conspiracy. Moreover, the government stated that a separate trial would be substantially as long as a joint one, since a full exposition of the entire scheme was necessary to establish the significance of Giordano's separate conduct. On this record the advantages and economy of a joint trial clearly outweighed the remote possibility of unwarranted prejudice. *See* United States v. Donaway, 447 F.2d 940, 943 (9th Cir. 1971).

The balance may not have been so clear when Giordano moved for severance during trial. Although there is no suggestion of bad faith, the evidence against Giordano did not entirely justify government counsel's optimistic forecast. Nonetheless, there was sufficient evidence other than acts and statements of co-conspirators to show that Giordano participated in the conspiracy. Since this is so, it is difficult to understand how Giordano could have benefited from severance, for evidence of the acts and statements of the other defendants pur-

10. Rule 22, Fed.R.Crim.Pr., provides that "[a] motion to transfer under these rules may be made at or before arraignment or at such other times as the court or these rules may prescribe," suggesting that the court may decline to entertain a late motion. *See* United States v. Tremont, 351 F.2d 144, 146 (6th Cir. 1965); Cagnina v. United States, 223 F.2d 149, 154 (5th Cir. 1955). Here, there has been a change in the situation since the initial venue decision. Nonetheless, to avoid the obvious opportunity for abuse it was proper to require a greater showing of inconvenience when trial was imminent.

suant to and in furtherance of the conspiracy would have been admissible against Giordano if tried alone.[11] United States v. Kenny, 462 F.2d 1205, 1218 (3d Cir. 1972); *see also* United States v. Roselli, 432 F.2d 879, 901 (9th Cir. 1970). Moreover, as the government asserted, all or substantially all such evidence probably would have been introduced in a separate trial. It is possible that the government might have considered the time and effort required for a separate trial too great a price to pay for the conviction of Giordano alone, but loss of that possibility hardly demonstrates that Giordano was "prejudiced by a joinder" within the meaning of Rule 14.

The trial judge took great pains to protect Giordano's right to an independent evaluation by the jury of the evidence against him. Twice during voir dire the court admonished the jury that each defendant—naming them, including Giordano—was entitled to be judged as an individual. No less than six times during instructions to the jury the court stressed the importance of separate determinations of each defendant's guilt or innocence on the basis of the evidence pertaining to the particular defendant. Several times the court warned that association with participants in a conspiracy does not prove that a defendant was a member of the conspiracy. This jury's ability and determination to make discriminating judgments is evidenced by the fact that it did not convict one of the most active participants in the conspiracy, defendant Polizzi, on one of the nine substantive counts on which he was charged. Obviously, this jury did not render a mass judgment. United States v. Berlin, 472 F.2d 13, 15 (9th Cir. 1973). There may be cases in which even careful jury instructions cannot cure the possibility of prejudice by association inherent in conspiracy trials,[12] but this was not one of them.

Giving due recognition to the somewhat stricter showing required to justify severance when the trial has been partially or wholly completed,[13] we conclude that Giordano's motions for severance during trial were properly denied.

## XIV. *Giordano's Requested Instruction*

Giordano rested at the close of the government's case-in-chief. He asked for a jury instruction that no evidence introduced thereafter could be considered against him. The request was denied. Giordano's co-defendants then testified in their own defense. In arguing the case to the jury, the government

---

11. Giordano stresses the fact that a very small proportion of the trial transcript relates directly to him; the government engages in elaborate analyses which, it claims, show that Giordano was not as peripheral to the proceedings as he claims. We do not consider, however, that the exact quantity of evidence relating to a conspiracy defendant personally is important in determining whether severance should have been granted. Although there are some cases which take this factor into account (*see* United States v. Branker, 395 F.2d 881, 888 (2d Cir. 1968); United States v. Donaway, 447 F.2d 940, 943 (9th Cir. 1971)), they concern defendants against whom conspiracy charges were dismissed during trial. Dismissal of a conspiracy charge does not mean that severance is required. Schaffer v. United States, 362 U.S. 511, 516, 80 S.Ct. 945, 4 L.Ed.2d 921 (1960). It does, however, shift the balance of factors to be considered, *see Schaffer, supra;* a separate trial would not entail a replay of the joint conspiracy trial, and much of the evidence admitted in the joint trial could not be considered against the defendant no longer charged with conspiracy. In the instant case, most of the evidence not directed to Giordano personally was nonetheless admissible against him, so that the proportion of personally oriented evidence is not important.

12. *See* Krulewitch v. United States, 336 U.S. 440, 454, 69 S.Ct. 716, 93 L.Ed. 790 (1949) (Jackson, J., concurring); United States v. Donaway, 447 F.2d 940, 943 (9th Cir. 1971). *But see* United States v. Cozzetti, 441 F.2d 344, 349 (9th Cir. 1971); United States v. Patterson, 455 F.2d 264, 266–267 (9th Cir. 1972); United States v. Roselli, 432 F.2d 879, 902 (9th Cir. 1970), all holding that careful jury instructions can be sufficient to guard against this kind of possible prejudice from joinder.

13. ABA, Standards Relating to Joinder and Severance 33 (Approved Draft 1968).

drew implications from this testimony adverse to Giordano.

■ Giordano's decision not to offer evidence in his own behalf preserved his right to a review of the denial of his motion for acquittal on the basis of the government's evidence alone. *See* United States v. Figueroa-Paz, 468 F.2d 1055, 1058 (9th Cir. 1972). But this is not to say, if denial of the motion to acquit was proper, that the jury was not entitled to consider *all* of the evidence, including that presented by Giordano's co-defendants, in determining Giordano's guilt.

■■ Evidence offered in defense in the trial of a single defendant is available for all purposes, and the rule is the same in a joint trial of multiple defendants—evidence offered by one may support the conviction of the others. *See* Rickey v. United States, 242 F.2d 583, 586 (5th Cir. 1957); Maupin v. United States, 225 F.2d 680, 682 (10th Cir. 1955). This court has held that the same rule is applicable even to a defendant who has rested at the close of the government's case, and an instruction of the kind sought by Giordano is therefore properly refused. Brown v. United States, 56 F.2d 997, 999–1000 (9th Cir. 1932).[14]

■ There is a substantial reason for the rule. One purpose of a joint trial of defendants allegedly involved in a single scheme is to facilitate evaluation by the jury of the evidence against each defendant in light of the entire course of conduct. "Such procedure not only increases the speed and efficiency of the administration of justice but also serves to give the jury a complete over-all view of the whole scheme and helps them to see how each piece fits into the pattern." Rakes v. United States, 169 F.2d 739, 744 (4th Cir. 1948). *See* ABA Standards Relating to Joinder and Severance 39 (Approved Draft 1968). This purpose of joinder would be frustrated as to a particular defendant if he could bar consideration as to him of some of the relevant evidence by resting before that evidence was introduced.

■ As we emphasized in *Brown*, a defendant who rests his case may nonetheless cross-examine or introduce evidence to impeach or contradict a co-defendant who testifies thereafter. *See also* United States v. Zambrano, 421 F. 2d 761, 763 (3d Cir. 1970). In the present case, as in *Brown*, there was no request to cross-examine the co-defendants or to admit rebuttal evidence. It is even clearer here than in *Brown* that "if such request had been made, it would have been granted," 56 F.2d 1000, since the trial judge asked Giordano's attorney after each defense witness whether he had any questions to ask by way of cross-examination.[15]

## XV. *Sufficiency of the Evidence— Giordano*

We consider Giordano's contention that the evidence was insufficient as to him separately from the same contention as to other defendants. The case

14. Giordano cites one instance in which the instruction he requests was given, United States v. Schneiderman, 106 F.Supp. 906, 928 (S.D.Calif.1952), but there was no discussion in *Schneiderman* of the issue. *See also* United States v. Interstate Engineering Corp., 288 F.Supp. 402, 413–414 (D.N.H.1967); Devitt & Blackmar, Federal Jury Instructions § 10.06 (1970). *But see* United States v. Zambrano, 421 F.2d 761, 763 (3d Cir. 1970), supporting the *Brown* holding by necessary implication.

15. Because Giordano neither cross-examined his co-defendants nor offered rebuttal evidence, we are not faced, either here or in the next section of this opinion dealing with Giordano's motion for acquittal, with the problem presented in Cephus v. United States, 117 U.S.App.D.C. 15, 324 F.2d 893, 897–898 (1963). In *Cephus*, the issue was whether a defendant waives his right to test the government's case-in-chief on appeal if he offers evidence only to counter a co-defendant's incriminating evidence; the Court of Appeals for the District of Columbia held that there is no waiver. This court has never squarely accepted or rejected the Cephus rule. *See* United States v. Figueroa-Paz, 468 F.2d 1055, 1058 (9th Cir. 1972); Verdugo v. United States, 402 F.2d 599, 604 n. 4 (9th Cir. 1968).

against Giordano was the weakest; and, unlike other defendants, Giordano did not waive his right to review of the motion to acquit made at the close of the government's case. For the latter reason, we consider only the evidence produced against Giordano in the prosecution's case-in-chief.

 As Giordano points out, the government offered no direct evidence of his participation in the conspiracy.[16] But "circumstantial evidence is not inherently less probative than direct evidence," United States v. Nelson, 419 F. 2d 1237, 1239 (9th Cir. 1969), and, in many conspiracy cases, is the only kind of evidence available. White v. United States, 394 F.2d 49, 51 (9th Cir. 1968). Thus, denial of the motion to acquit is subject to the same standard on review as it would be if there were direct evidence of guilt: whether "jurors reasonably could decide that they would not hesitate to act in their own serious affairs upon factual assumptions as probable as the conclusion" that Giordano participated in the conspiracy. United States v. Nelson, *supra,* 419 F.2d at 1245.

The government's theory was that at Zerilli's solicitation Giordano arranged for the investment of $150,000 in VFI when the enterprise was in critical need of funds; that the investment was made through Sansone, a St. Louis real estate investor and bank director, acting as a "front"; and that following the investment Giordano participated at various critical stages in the illegal enterprise.

Some of the government's circumstantial evidence is described briefly in the margin.[17] Possibly the series of events disclosed by the evidence could be ex-

---

16. Friedman, a co-conspirator who testified for the government, and Feil, another witness who testified directly to the illegal involvement of some defendants, offered no evidence implicating Giordano; none of the four government witnesses who might, on the prosecution's theory, have known of Giordano's involvement in the conspiracy, directly implicated him.

17. Giordano and Zerilli were close friends. Giordano lived in St. Louis, Zerilli in Detroit. There were telephone calls between Giordano's home and office and Zerilli's, as well as other calls charged to Zerilli's credit card and placed to Giordano's numbers, at various key times in the course of events between June and November, 1967. Giordano knew the Cusumanos and the Sansones in St. Louis. The Sansones did not know Zerilli.

The need for additional money, which resulted in the issuance of the Class C debentures Sansone later bought, developed in early June. There were calls between telephones listed to Giordano and Zerilli at that time. Zerilli came to St. Louis for two days on June 8.

The Sansones began gathering money for their VFI investment after Zerilli visited St. Louis, but before the Class C debentures in which they invested were officially issued. They could have learned about the investment possibility only from a person having knowledge of the inner operations of VFI.

In early August, Giordano repaid an overdue loan to the Cusumano family trust. Less than three weeks later, Sansone took out a loan from the same trust. This loan was part of the money Sansone eventually invested in VFI. The Sansone loan was the only business transaction ever consummated between Sansone and the Cusumano family. It was unsecured. Although the VFI debentures in which Sansone invested yielded 4% interest, the loan from Cusumano was at 7%, an anomaly for which Sansone had no convincing explanation.

The Sansone investment was withdrawn less than 60 days after it was made, after Sansone was told by the Nevada Gaming Commission that he would have to apply for a gaming license, disclose the source of the invested funds, and provide fingerpints. Sansone testified that he withdrew only because, "I never anticipated that I would have to be classified as a gambler when I bought the debenture." But from the outset the Sansones admittedly knew they were investing in a gambling casino.

Giordano made five trips to Las Vegas between July and November, 1967. The Giordanos have no business interests or relatives in Las Vegas, and Giordano was not a gambler. Each of these trips was closely preceded, or followed, or both, by telephone contact between Giordano telephones and Zerilli telephones or phone calls charged to Zerilli. Each trip coincided with an important event in the unlawful scheme. For example, trips in September and November coincided with the beginning and end of the $150,000 investment.

On September 12 there was a series of phone calls between Zerilli's home and Giordano's home and business. The next day, Sansone marshaled the entire $150,000. On that same day there was a call from a Zerilli telephone to Giordano's telephone. On September 14 Sansone flew to Las Vegas with the money

plained as coincidence, or as normal contacts among friends. On the other hand, "[t]he jury undoubtedly could have found these events too interlocked to constitute coincidence" (United States v. White, *supra*, 394 F.2d at 53); it could have drawn from the events the inferences suggested by the prosecution —that Giordano was brought into the conspiracy at least as early as June; that he arranged for the investment of $150,000 in VFI through Sansone; and that the purpose of Giordano's five trips to Las Vegas in 1967 was to watch over this hidden interest in VFI and participate in various key decisions. There comes a point when the innocent explanation is so much less likely than the culpable one that jurors properly could decide that a defendant in fact was acting in furtherance of the conspiracy and shared its illegal purpose. We believe that point was reached here as to Giordano.

Three legal arguments subsidiary to Giordano's challenge to the sufficiency of the evidence should be mentioned.

■ 1. The government called Cusumano and Sansone as witnesses. Both denied that Giordano was involved in a Cusumano loan to Sansone. Giordano argues that the government is bound by this testimony. But the notion that a party is bound by the testimony of every witness it calls is "long discredited," Rodgers v. United States 402 F.2d 830, 833 (9th Cir. 1968), and is clearly not the law of this circuit. *See* cases cited in *Rodgers,* 402 F.2d at 833, n. 1.

■■ Rodgers does hold that the government cannot rely on an inference when the *only* evidence presented by the government is inconsistent with the inference the government wishes drawn. However, *Rodgers* itself acknowledges

that this does not "mean that in every case where some of the government's evidence is arguably contrary to an inference that it wishes to have the jury draw from other evidence, the inference may not be drawn." 402 F.2d at 834. *See also* United States v. Payne, 467 F.2d 828, 831 (5th Cir. 1972). Further, in *Rodgers* the evidence inconsistent with the desired inference was presented by a disinterested witness and was embodied in an uncontested document. Here, Cusumano and Sansone were interested witnesses with motives to dissemble about Giordano's role, and the prosecution presented a great deal of other evidence, albeit circumstantial, connecting Giordano with the loan. It may be reasonable to require the prosecution to do more than rely on a general inference to counteract its own uncontested documentary evidence, but an inference specifically supported by other evidence is not barred simply because it is inconsistent with testimony of witnesses who were called by the government but have every reason to protect the defense.

■ 2. Giordano argues that telephone company records showing calls between telephone numbers assigned to Giordano and Zerilli were inadmissible because there was no direct evidence as to who participated or what was said, citing Laughlin v. United States, 226 F. Supp. 112, 113 (D.D.C.1964). But this case held only that such records were insufficient corroboration in a perjury case, where "direct and positive evidence of falsity of defendant's sworn statement" is required, and "circumstantial evidence thereof is insufficient, no matter how persuasive." 226 F.Supp. at 114. The Court of Appeals held such records admissible in a conspiracy case, distinguishing the district court's ruling

---

to make the investment. He checked into the Frontier Hotel. Sixteen minutes later, Giordano checked into the Dunes Hotel. Four days later, Sansone deposited the $150,000 in VFI's account, received the debentures, and left Las Vegas. Giordano departed the following day. In November, a telephone call to Giordano was charged to Zerilli on the same

day the Nevada Gaming Commission's letter was sent to Sansone. Giordano went to Las Vegas on November 9; Zerilli arrived and checked into the Frontier Hotel under an assumed name on November 10; and Sansone arrived on November 11 to complete the withdrawal of the $150,000 investment.

in the earlier perjury case because of the high degree of corroboration necessary in a perjury case. Laughlin v. United States, 128 U.S.App.D.C. 27, 385 F.2d 287, 293 (1967).[18]

Giordano also contends the government cannot rely upon inference to establish the contents of the telephone calls, citing Osborne v. United States 371 F.2d 913, 927–929 (9th Cir. 1967). But in *Osborne,* each telephone call was the subject of a separate count charging a separate violation of 18 U.S.C. § 1343, "Fraud by wire, radio, or television." Proof of the contents of the particular telephone call was therefore crucial to conviction on the particular count. In the present case, the exact content of each telephone call is not crucial to conviction; the telephone calls themselves are not the subject of the charge. Proof of their occurrence, especially their timing and frequency, is merely circumstantial evidence tending, with other circumstantial evidence, to show Giordano's participation in the conspiracy.

 3. Giordano makes the same contention with respect to proof regarding his trips to Las Vegas—that no inference can be drawn from the fact that they occurred—and we reject it for the same reasons. He also argues that hotel records evidencing his stays at the Dunes Hotel in Las Vegas in 1967 should not have been admitted because other contemporaneous hotel records were destroyed "in accordance with routine hotel policy" prior to the return of the indictment in 1971. The argument is that if the indictment had been returned earlier the records might have been in existence and might have contained exculpatory or explanatory evidence demonstrating that Giordano's visit had an innocent purpose. Giordano cites United States v. Marion, 404 U.S. 307, 92 S.Ct. 455, 30 L.Ed.2d 468 (1971).

The contention is frivolous. The Sixth Amendment does not apply to pre-indictment delay, 404 U.S. at 313, and Giordano has not shown that the delay involved here violated the Due Process Clause. 404 U.S. at 324–326. We need not consider, therefore, whether suppression of evidence would be a proper remedy if a due process violation had occurred. *Cf.* Strunk v. United States, 412 U.S. 434, 93 S.Ct. 2260, 37 L.Ed.2d 56 (1973).

DUNIWAY, Circuit Judge:

I concur in the portions of this opinion prepared by Judges Renfrew and Browning.

XVI. *Criminal Liability of Emprise Corporation.*

Appellant Emprise Corporation argues that it is not liable for any criminal acts committed by its predecessor in interest. The facts are these: Before March 1, 1970, there was a New York corporation called High Park Corporation, which owned all of the shares of another New York corporation, Emprise Corporation (Old Emprise). On March 1, 1970, Old Emprise merged into its parent, High Park Corporation. On March 17, 1970, High Park Corporation amended its corporate name to Emprise Corporation (New Emprise).

The February 26, 1971, indictment in this case charged "Emprise Corporation" as a defendant. In July, 1971, it became clear that this meant Old Emprise, and, on September 9, 1971, the district court dismissed as to Old Emprise for want of personal jurisdiction over it. The government filed an information against New Emprise. New Emprise moved to dismiss, but this motion was denied, and New Emprise was convicted of violating 18 U.S.C. §§ 371 and 1952 and was fined $10,000. The charged offense was committed by Old Emprise, before the merger.

18. In the conspiracy case, there was evidence identifying the parties to the telephone calls (*see* 385 F.2d at 293), but the Court of Appeals did not rest admissibility upon this circumstance.

The question is whether the surviving corporation of a merger, here New Emprise, can be held criminally liable for acts committed by a former subsidiary constituent corporation (Old Emprise) which later merged into the survivor.

Appellants argue that in this federal case we must apply federal law, regardless of what the state law may be, and that under federal law only the constituent corporation, not the surviving corporation, can be prosecuted. Of course we apply federal law. That, however, does not answer the question. Federal courts, in deciding federal cases, often borrow otherwise applicable state law as the federal law to be applied in a federal case when doing so is reasonable and there is no contrary federal policy. Here, Old Emprise and New Emprise are New York corporations. We can think of no federal policy that would prohibit our borrowing New York law in deciding whether New Emprise is liable for a crime committed by Old Emprise. Neither can appellants, beyond mere assertion.

Under the Constitution, the federal government is not expressly granted the power to form corporations; it may do so only under the necessary and proper clause.[1] *See, e. g.*, McCulloch v. Maryland, 1819, 17 U.S. (4 Wheat.) 316, 4 L.Ed. 579. The result is that nearly all corporations in the United States are creatures of state law. This also means that when Federal statutes refer to "corporations" they necessarily include within that word corporations created under state law. Some Federal statutes are expressly applicable to state created corporations. *See, e. g.*, 15 U.S.C. § 7; Melrose Distillers v. United States, 1959, 359 U.S. 271, 272, 79 S.Ct. 763, 3 L.Ed.2d 800. In this case New Emprise was convicted of violations of 18 U.S.C. §§ 371 and 1952. § 371 refers to "persons" and § 1952 to "[w]hoever." Under the Federal Rules of Construction, 1, U.S.C. § 1.

"In determining the meaning of any Act of Congress, unless the context indicates otherwise—

\* \* \* \* \* \*

the words 'person' and 'whoever' include corporations \* \* \* as well as individuals;

\* \* \* \* \* \* "

The term "corporations" as used in 1 U.S.C. § 1 clearly includes corporations formed under state law. See Alamo Fence Company of Houston v. United States, 5 Cir., 1957, 240 F.2d 179, 181. Nothing in the contexts of §§ 371 and 1952 indicates meanings for the terms "persons" and "whover" other than those of 1 U.S.C. § 1. Therefore, the existence and status of corporations charged under §§ 371 and 1952 should be determined by reference to the law of the state of their incorporation, unless the application of that law would conflict with federal policy. *Cf.* Melrose Distillers v. United States, *supra*, 359 U.S. at 274. In this case, no such conflict exists, and New York law, therefore, will be applied.

Convenience and common sense also point to the adoption of New York law as the federal law in this case, for the purpose of determining whether New Emprise is criminally liable. Both Old and New Emprise are artificial creations, wholly dependent on New York law for their existence. New York law defines their powers, rights and liabilities, prescribes their procedures, governs their continued existence, and defines the terms upon which mergers may occur and the effect to be given to mergers. These corporations were created under New York law by people, however, and any penalty imposed on them is, indirectly, a penalty imposed upon the people who own and control them. If New York law provides for the imposition of such a penalty for acts for which those people bear the ultimate responsibility, there is no good reason for relieving them of the penalty because it arises

---

1. U.S.Const. art. I, § 8.

from federal law. See Alamo Fence Company of Houston v. United States, *supra,* 240 F.2d at 183.

■ Under modern state corporation laws, a corporation once formed, in the absence of a provision limiting its juristic life, exists perpetually unless it is dissolved or its corporate character is annulled.[2] It is often said that the merger of a corporation into another is similar to the death of an individual, in that all current or future litigation by or against it is abated except insofar as the state of incorporation may continue its juristic life. Melrose Distillers v. United States, 1959, 359 U.S. 271, 272, 79 S.Ct. 763, 3 L.Ed.2d 800; Oklahoma Natural Gas Co. v. Oklahoma, 1927, 273 U.S. 257, 259–260, 47 S.Ct. 391, 71 L.Ed. 634; United States v. Safeway Stores, Inc., 10 Cir., 1944, 140 F.2d 834, 836; United States v. Brakes, Inc., 157 F. Supp. 916, 918–919 (S.D.N.Y.1958); United States v. Cigarette Merchandisers Ass'n, 136 F.Supp. 214, 215 (S.D. N.Y.1955) (and cases cited therein at 215, n. 4). We turn to the New York law to determine the effect of the merger in this case.

The relevant state statute governing the question here is N.Y.Bus.Corp. Law § 906(b)(3) (McKinney 1963, Consol.Laws, c. 4), which provides that after a certificate of merger or consolidation has been filed,

> The surviving or consolidated corporation shall assume and be liable for all of the liabilities, obligations and penalties of each of the constituent corporations. No liability or obligation due or to become due, claim or demand for any cause existing against any such corporation, or any shareholder, officer or director thereof, shall be released or impaired by such merger or consolidation. No action or proceeding, whether civil or criminal, then pending by or against any such constituent corporation, or any shareholder, officer or director thereof, shall abate or be discontinued by such merger or consolidation, but may be enforced, prosecuted, settled or compromised as if such merger or consolidation had not occurred, or such surviving or consolidated corporation may be substituted in such action or special proceeding in place of any constituent corporation.

■ The first sentence of § 906(b)(3) states that the surviving corporation is liable for its constituents' "liabilities, obligations and penalties. . . ." While no court has decided whether "liabilities" and "obligations" as used in § 906(b)(3) refer to criminal liabilities and obligations, two courts have held that these words, as used in other provisions of New York's corporation laws, do refer to criminal liability. United States v. Cigarette Merchandisers Ass'n., *supra* (construing § 90 of the New York Stock Corporation Law); People v. Bankers' Capital Corp., 1930, 137 Misc. 293, 241 N.Y.S. 693 (construing § 216(1)(e) of the New York General Corporation Law). We note, too, that § 906(b)(3) also uses the word "penalties." We therefore hold that the first sentence of § 906(b)(3) permits the maintenance of a prosecution against the surviving corporation for crimes allegedly committed by a constituent corporation.

Such a construction of New York's corporation law is not unique. New York courts have held that civil causes of action arising before a merger or consolidation may be instituted against the surviving or the consolidated corpora-

---

2. "Neither bankruptcy . . . nor cessation of business . . . nor dispersion of stockholders, nor the absence of directors . . . nor all combined, will avail without more to stifle the breath of juristic personality. The corporation abides as an ideal creation, impervious to the shocks of these temporal vicissitudes. Not even the sequestration of the as-

sets at the hands of a receiver will terminate its being." Petrogradsky Mejdunarodny Kommerchesky Bank v. Nat'l City Bank of New York, 1930, 253 N.Y. 23, 31–32, 170 N.E. 479, 482 (Cardozo, C.J.), reargument denied, 1930, 254 N.Y. 563, 173 N.E. 867, cert. denied, 1930, 282 U.S. 878, 51 S.Ct. 82, 75 L.Ed. 775.

tion. O'Brien v. New York Edison Co., et al. (two cases). 19 F.Supp. 968 (S.D.N.Y.1937); Cameron v. United Traction Co., 1902, 67 App.Div. 557, 73 N.Y.S. 981; Lee v. Stillwater and Mechanicville St. Ry. Co., 1910, 140 App.Div. 779, 125 N.Y.S. 840. Appellants cite numerous cases which hold that a constituent corporation [3] or a dissolved corporation [4] remains subject to criminal prosecution. None of these cases, however, holds that a surviving corporation (in the case of a merger or consolidation) may not be prosecuted. These cases therefore do not conflict with our holding. We adopt, as to the liability of New Emprise, the New York law as the federal law in this case. We leave to another day the question whether we would borrow applicable state law if that law were to purport to relieve both the constituent corporation and the surviving corporation of liability for crimes of the constituent corporation.

XVII. *Sufficiency of the Evidence.*

Appellants argue that the evidence is insufficient to sustain their convictions. Except as to appellant Giordano, whose arguments we have discussed above (see part XV, *supra*), their arguments lack substance. It would serve no useful purpose to set out the evidence in detail. We have examined it, and we find it more than sufficient.

XVIII. *The Taint of Illegal Electronic Surveillance.*

Appellants claim that the trial was materially tainted by leads from unlawful electronic surveillance.

Between 1962 and 1965, the government conducted electronic surveillance against appellants Zerilli, Polizzi and Giordano." The product of this surveillance is embodied in typewritten transcriptions or "logs" of the intercepted conversations. The government concedes that the electronic surveillance was conducted illegally.

The prosecutors were initially unaware of this surveillance, but on June 3, 1971, they were informed of it by the Justice Department. On September 8, 1971, the district court ruled that there would be a post-trial *Alderman* hearing.[5] An *in camera* hearing was held on November 13, 1971, at which the court ruled that pretrial access to the logs would be limited to appellants Zerilli, Polizzi, Giordano, and their respective attorneys. At the post-trial *Alderman* hearing, which commenced on June 12, 1972, and continued on June 13, June 14, June 15, June 23, and July 7, 1972, the court concluded that "the evidence in this case came from an independent source and was not tainted by the illegal electronic surveillance."

Appellants argue that the evidence accumulated from the unlawful surveillance was used in their prosecution and fatally contaminated their trial. Alternatively, they ask that we remand for a more complete *Alderman* hearing.

a. *Standing.*

Only Zerilli, Polizzi and Giordano were subjected to electronic surveillance and the court ordered that only these three appellants and their attorneys be given access to the logs. On appeal, appellants Shapiro and Bellanca assert that they, as coconspirators, should also have been given access to these logs.

---

3. United States v. Stone, 8 Cir. 1971, 452 F.2d 42; United States v. Anaconda American Brass Co., 210 F.Supp. 873 (D.Conn.1962); United States v. Maryland and Virginia Milk Producers, Inc., 145 F.Supp. 374 (D.D.C. 1956); United States v. Cigarette Merchandisers Ass'n, Inc., *supra*; United States v. Union Carbide and Carbon Corp., 132 F.Supp. 388 (D.Colo.1955), modified, 10 Cir., 1956, 230 F.2d 646.

4. Melrose Distillers, Inc. v. United States, *supra*; United States v. BBF Liquidating,

Inc., 9 Cir. 1971, 450 F.2d 938; Alamo Fence Co. of Houston v. United States, 5 Cir., 1957, 240 F.2d 179; United States v. P. F. Collier & Son Corp., 7 Cir., 1953, 208 F.2d 936; United States v. Globe Chemical Co., 311 F.Supp. 535 (S.D.Ohio 1969); United States v. Arcos Corp., 234 F.Supp. 355 (N.D.Ohio 1964); United States v. San Diego Grocers Ass'n, Inc., 177 F.Supp. 352 (S.D.Cal.1959); United States v. Brakes, Inc., *supra*.

5. Alderman v. United States, 1969, 394 U.S. 165, 89 S.Ct. 961, 22 L.Ed.2d 176.

This same argument was made by petitioners in Alderman v. United States, *supra*, and was rejected. 394 U.S. at 171–176. See also Mancusi v. DeForte, 1968, 392 U.S. 364, 88 S.Ct. 2120, 20 L.Ed.2d 1154; Simmons v. United States, 1968, 390 U.S. 377, 88 S.Ct 967, 19 L.Ed.2d 1247; Jones v. United States, 1960, 362 U.S. 257, 261, 80 S.Ct. 725, 4 L.Ed.2d 697; Wong Sun v. United States, 1963, 371 U.S. 471, 491–492, 83 S.Ct. 407, 9 L.Ed.2d 441; Goldstein v. United States, 1942, 316 U.S. 114, 121, 62 S.Ct. 1000, 86 L.Ed. 1312. The court's ruling as to standing was correct.

b. *The Existence of Taint.*

 At an *Alderman* hearing, the court must determine whether the prosecution used unconstitutionally seized material directly or indirectly to develop the evidence it produced at trial, or obtained its trial evidence from an independent and untainted source. Alderman v. United States, *supra*, 394 U.S. at 183. A defendant who shows that he was the victim of an unconstitutional search "must go forward with specific evidence demonstrating taint." 394 U.S. at 183. Then the burden shifts to the government to show that it acquired its evidence from an independent source.[6]

Appellants make numerous arguments to show that their trial was tainted by the use of the logs. We consider them seriatim.

1. *The benchside conference of March 28, 1972.*

Polizzi testified on direct examination that he was unable to obtain a Nevada gambling license in March, 1966, because he had a "problem." [R.T. 5391, 5398, 5402.] On cross-examination, the prosecutor asked the nature of Polizzi's prob-

lem. Polizzi then stated that his "problem" was that in 1963 he had been placed on the Attorney General's list of Mafia figures. [R.T. 5466.]

On redirect examination, Polizzi's attorney returned to the subject of the Mafia. Polizzi testified:

"It was Mr. George Edwards who was the police commissioner of the City of Detroit that made his testimony before the Senate Committee, and he was the one that was directly responsible for putting my name on this chart.

. . . I was very disturbed and felt that I was falsely accused. I wrote a letter to the Mayor of Detroit and felt that it was unjust that for no rhyme or reason to just be put on there and be falsely accused of these things . . . ." [R.T. 5576–77.]

At this point, Mr. Kotoske, the prosecutor, approached the bench and, outside of the jury's hearing, told the court that Polizzi was perjuring himself and threatened to introduce the surveillance logs showing Polizzi's ties with organized crime in Detroit:

"Mr. Kotoske: . . . [I]f [Mr. Murphy, Polizzi's attorney] read those logs at all he understands that this man on the witness stand [Polizzi] and Tony Zerilli laid out the whole Mafia organization in Detroit, how they cut up black money—

. . . . . .

They laid out the whole organization, who is on this payoff, who is running the rackets, how the money is transferred, all discussion about black money, who it is that they have to eliminate from the organization, who they are going to—the whole complete thing, the complete structure is laid out there.

---

6. "The burden is, of course, on the accused in the first instance to prove to the trial court's satisfaction that wire-tapping was unlawfully employed. Once that is established—as was plainly done here—the trial judge must give opportunity, however closely confined, to the accused to prove that a substantial portion of the case against him was a fruit of the poisonous tree. This leaves ample opportunity to the Government to convince the trial court that its proof had an independent origin." Nardone v. United States, 1939, 308 U.S. 338, 341, 60 S.Ct. 266, 268, 84 L.Ed. 307. *See also Alderman, supra,* 394 U.S. at 183.

I have sat by for about six weeks and let this nonsense go on. If he continues to persist in this, I have no alternative but to confront this witness with his own transcription of his voice and make him out a crown liar right in this courtroom.

I don't want to do that . . . .

We had better draw the line and abandon the topic or I am telling counsel I will come forward with those logs . . . .

The Court: Mr. Murphy, let me say this:

. . . [T]his thing has gone far enough. You have the ability to have your client make the explanation that he has made, but my suggestion to you—I am not ordering it at all, but my suggestion to you is that you ought not go much further with that, because it may open a wider door than you want to have opened. And I do not want this trial to get into a public accusation of who is or is not a member of the Mafia . . . ." [R.T. 5578–80.]

The line of questioning about the Mafia was dropped by Polizzi's counsel and the government never introduced the logs to impeach Polizzi's testimony.

■■■ Appellants contend that the incident was a use of the surveillance logs at the trial and tainted the entire case. We cannot agree although it was indeed a "use." First, no evidence from the logs was actually introduced. The prosecutor only threatened to use the logs to impeach Polizzi's character. Second, the government's threat came only after Polizzi at least twice testified to his own lack of Mafia connections, once on direct and again on cross. It cannot be said that the prosecutor's threat hindered the defense from making its point to the jury. Third, the threat to

use the tapes did not form part of the government's case; it related solely to impeachment, after Polizzi had testified to his own lack of Mafia ties. Walder v. United States, 1954, 347 U.S. 62, 65, 74 S.Ct. 354, 98 L.Ed. 503, *cf.* Harris v. New York, 1971, 401 U.S. 222, 91 S.Ct. 643, 28 L.Ed.2d 1. Such use would not be an unlawful taint.

2. *The leak to the press.*

On March 29, 1972, the day after the benchside conference, one Gene Blake, a *Los Angeles Times* reporter, was seen reading the government's copy of the previous day's transcript. [R.T. 5786.] Defendants' counsel accused the prosecutor of deliberately providing Mr. Blake with the transcript; the prosecutor denied this charge.[7] Defendant's counsel then asked the court to order the *Times* not to report on the March 28 benchside conference, but the court refused.

■■■ The next day a *Times* article was headlined "Transcript Shows U. S. Bugged Vegas Defendants' Mafia Talks." The article contained direct quotes from the March 28 benchside conference concerning the surveillance logs. Appellants assume that the jury saw this article and took it into account in reaching its verdict, and that therefore the trial was tainted by information from the logs. We cannot agree. There was no evidence that any juror read this article, nor were the logs used by the jury in their deliberations. Thus there was no "relevance to [appellants' convictions] of any conversations which may have been overheard through . . . surveillance." Alderman v. United States, *supra*, 394 U.S. at 186.

3. *The Friedman sentencing memorandum.*

One of the major sources of the prosecutor's case was the Friedman sentencing memorandum, a document prepared

---

7. "Mr. Kotoske: May I make a full and complete but short statement, your Honor?

[A]bout giving transcripts of the daily proceedings to any newspaperman, I never in my life have done that. I have never done that in this case. I did see Mr. Blake read-

ing from the transcript and I personally took it upon myself to go over to him this morning and ask him to please not print anything that transpired at the side bar. That is the fact, that is not fantasy." R.T. 5790–91.

in connection with the sentencing of Maurice Friedman on February 3, 1969, in another case. Appellants claim that this document was tainted by information from the surveillance logs.

Looking at the evidence in the light most favorable to the government, the following testimony was produced concerning the sentencing memorandum: U. S. Attorney David Nissen, who wrote this memorandum, relied on three sources for its preparation: (1) information he received from FBI agent Wayne Hill, (2) a tape supplied to him by one Dr. Victor Lands in connection with another trial (the Lands transcript), and (3) information he received from (then) U. S. Attorney William Matthew Byrne, Jr. [R.T. 10,029–31.]

▮▮▮▮ Appellants do not claim that the Lands transcript or Byrne's information is tainted; their only objection concerns agent Hill's information. Hill testified that all the information he received, which he subsequently passed on to Nissen, came from either "live Bureau informants" (civilian informants) or from the Intelligence Division of the Los Angeles Police Department. [R.T. 9421–24.] He was then asked:

"Q. Now do you know, Mr. Hill, that any of the information you provided Mr. Nissen that found its way into this sentencing memorandum was the result or can in any way be attributed to the surveillance logs in this case?

A. No, it could not." [R.T. 9425.]

On cross-examination, Hill said that these live Bureau informants gave information to various FBI agents around the country, who passed the material on to Hill, who, in turn, passed the information on to Nissen, who wrote the memorandum. [R.T. 9522–23, 9563–65.]

Although the names of the informants were not revealed [R.T. 9523], agent Hill did provide the names of two FBI agents who received such information. [R.T. 9524, 9531, 9563–64.] The appellants did not produce any evidence to refute Hill's testimony. The court properly concluded that the Friedman sentencing memorandum was not tainted.[8]

4. *Lack of FBI monitors at the Alderman hearing.*

Appellants argue that they did not receive a fair *Alderman* hearing because only one of the FBI personnel who conducted electronic surveillance was called as a witness.

*Alderman* provides a flexible standard as to what witnesses must be examined in a taint hearing:

"Armed with the specified records of overheard conversations and with the right to cross-examine the appropriate officials in regard to the connection between those records and the case made against him, a defendant may need or be entitled to nothing else. Whether this is the case or not must be left to the informed discretion, good sense, and fairness of the trial judge." *Alderman, supra,* 394 U.S. at 185.

The district court adopted the following procedure to govern the taint hearing: There were numerous government officials throughout the country who had had access to the surveillance logs. The critical issue at the taint hearing, however, was not whether these officials had had access to the logs but whether any knowledge of the contents of the logs was imparted by these officials to the United States prosecutors in Los Angeles. Thus, instead of bringing all the government officials to the hearing, the court ordered the government to provide

---

8. Appellants claim that "the court refused even to permit appellants, at their own expense to produce those agents to find out the names of the purported live informants who are the sources of the Friedman sentencing memorandum allegations [52 RT 10,474–76]." Electronic Surveillance Brief at 20. The court clearly acted within its discretion in refusing to allow the names of the informants to be revealed. Appellants, however, could have called these agents to ask other questions about how they gathered the information which was subsequently passed on to Hill. The court did not preclude the appellants from calling these agents.

the defense with the names of all of them so that the defendants could ask each government prosecutor, on the witness stand, whether he had received any information about the logs from the named officials.[9] [Clerk's Transcript (hereinafter referred to as C.T.) 3321.]

At the taint hearing, three members of the prosecution team testified that the source of this case was the Friedman interview and sentencing memorandum.[10] Two members of the team testified that they were not even aware of the existence of the logs when the indictments in this case were handed down on February 26, 1971.[11] Judge Byrne, who left the United States Attorney's office in May, 1970, testified that he did not know that the logs existed in February, 1970, when he interviewed Mr. Friedman. [R.T. 9225.] U. S. Attorney Hornbeck knew of the existence of the logs, but had not read them and therefore did not use any information from the logs to assist him before the grand jury. [R.T. 10,262.] In addition, three members of the team testified that they did not contact any government officials who had access to the logs.[12] Two other attorneys did contact one of these officials, James Ritchie,[13] but none of the information received from Ritchie related to the logs. This information, which consisted of some bank records, audits, and IRS personal interviews, was the result of subpoenas served on banks or of personal interviews.

The picture which thus emerges from the taint hearing is that no member of the prosecution team had read the logs or had any information derived from them when the indictments were handed down. Only two attorneys had contacted a government official who had access to these logs, and the information received from him was not derived from the logs. Moreover, by the time the indictments were handed down the evidence gathering process was complete, and no other significant evidence was produced at the trial. Counsel for appellants did not produce any witnesses to refute this testimony.

While FBI monitors have testified at some taint hearings,[14] there is no rule that they must testify. The issues raised in cases in which the court has ordered FBI personnel to testify [15] are obviated here as a result of the prosecution team's undisputed testimony that they received no information related to the logs from any government officials who had access to the logs.

The district court concluded that the government met its "ultimate burden of persuasion to show that its evidence is untainted." *Alderman, supra,* 394 U.S. at 183. Having carefully examined the evidence produced at the taint hearing, we agree with the district court's finding.

Affirmed.

---

9. The court did not preclude calling any of these officials as witnesses, but stated only that they should not be called "unless there is some reason to believe that any of those persons communicated any information received from the tapes to any of the persons who had charge of the preparation of the evidence in this case." C.T. 3321.

10. R.T. 9224 (U. S. Attorney Byrne), 9546–47 (agent Hill), 10,031 (U. S. Attorney Nissen).

11. R.T. 10,032–33 (U. S. Attorney Nissen), 9283 (U. S. Attorney Friedman).

12. R.T. 9282–84 (Friedman), 9428–29, 9437–39 (Hill), 10,033 (Nissen).

13. R.T. 10,245–46 (Hornbeck), 9751 (Uelmen).

14. *See, e. g.,* United States v. Stassi, 5 Cir., 1970, 431 F.2d 353; Baker v. United States, 139 U.S.App.D.C. 126, 1970, 430 F.2d 499, cert. denied, 1970, 400 U.S. 965, 91 S.Ct. 367, 27 L.Ed.2d 384; United States v. Clay, 5 Cir., 1970, 430 F.2d 165, rev'd. on other grounds, 1971, 403 U.S. 698, 91 S.Ct. 2068, 29 L.Ed.2d 810; United States v. Ivanov, 342 F.Supp. 928 (D.N.J.1972).

15. *See, e. g.,* United States v. Giordano, 6 Cir., 1971, 440 F.2d 449; United States v. Alderisio, 10 Cir., 1970, 424 F.2d 20.